John UBERTI,

v.

**LINCOLN NATIONAL LIFE INS. CO.**

No. 3:99cv636 (JBA).

United States District Court,
D. Connecticut.

March 28, 2001.

**MEMORANDUM OF DECISION**

ARTERTON, District Judge.

In this diversity case, John Uberti seeks benefits he claims are due him under a disability insurance policy that he purchased from Connecticut General Life Insurance Company in November 1978, and which was subsequently transferred to Lincoln National on January 1, 1998. After severely injuring his left knee in an accident in February 1994, Mr. Uberti received total disability benefits under this policy of $450 per month from April 1994 through March 5, 1999. On that date, Lincoln National terminated plaintiff's

benefits based on its determination that he was only entitled to 60 months of benefits, the maximum indemnity period for "sickness," not lifetime benefits for "injuries."

Mr. Uberti claims that by discontinuing his disability benefits after March 1999, Lincoln National breached its contract of insurance as well as its implied covenant of good faith and fair dealing.[1] A bench trial was held August 16 through 21, 2000. Based on the evidence presented at trial, for the reasons that follow, the Court finds that plaintiff has proved defendant's liability for both breach of contract and breach of the implied covenant of good faith and fair dealing by a preponderance of the evidence. (Fed.R.Civ.P. 52(a).)

## FINDINGS OF FACT

The following describes the chronological factual background of this case. Additional factual findings are contained in the discussion of conclusions of law, *infra*.

John Uberti purchased disability benefit insurance policy # MI 703490 from Connecticut General Life Insurance Company (Connecticut General) in November 1978. Mr. Uberti, who did not continue his education beyond his junior year of high school, purchased the disability policy to provide financial protection for his family if he became disabled.

When plaintiff was seven years old (1952), he was struck by a car and his injuries required multiple surgeries on his shattered left femur, resulting in significant leg shortening, left patella malalignment and chronic low back pain. Nonetheless, Mr. Uberti led a physically active life before the February 1994 knee injury. He played three sports in high school, and continued to play touch football, racquetball and tennis as an adult. After leaving high school, he became an operator of heavy construction equipment for many years without disability until the 1994 accident. After he completed his childhood treatment for the injured left leg, he received no further treatment for any complaints related to his left knee before the February 1994 fall, although the medical records do reveal an injury to his right knee in 1984.

On Sunday, February 6, 1994, Mr. Uberti severely injured his left knee when he slipped on some ice while attempting to break up a melee between his nephews. Following the accident, Mr. Uberti consulted with Dr. Peter Naman, an orthopedist based in Milford, Connecticut, who treated Mr. Uberti for torn lateral and medial menisci in his left knee.[2] On March 16, 1994, Mr. Uberti underwent the first of two orthoscopic surgeries on his left knee, Pl. 2 at L168, followed by physical therapy. In May 1994, Mr. Uberti moved from Connecticut to Florida so his wife could accept a better job there as a hospital administrator. In Florida, Mr. Uberti remains under

---

**1.** At the close of Mr. Uberti's evidence, the Court granted Lincoln National and Connecticut General Life Insurance Company's oral motions made pursuant to Fed.R.Civ.P. 50 dismissing his CUIPA claim (Count Two) and entering judgment in their favor on the CUTPA claim (Count Four). In addition, the Court dismissed Connecticut General Life Insurance on the remaining contract and breach of the implied covenant of good faith and fair dealing claim which was based on Lincoln National's denial of benefits in March 1999.

**2.** "In each knee joint attached to and resting on the top joint surfaces of the tibia are two crescentic wedge shaped cartilaginous pads called the internal and external semilunar cartilages, or more commonly, the medial meniscus and lateral meniscus. Principal functions of the menisci are to increase the stability of the knee joint and to protect opposing joint surfaces of the femur and tibia." See Pl. 2 at L184.

the medical care of Dr. Vincent Kiesel, a board certified orthopaedic surgeon. Dr. Kiesel testified by deposition. Pl. 5.

On March 7, 1994, Mr. Uberti filed a Disability Income Claim Form with Connecticut General Life, Ins. Co. based on the February 6, 1994 accident. *See* Pl. 2 at L187. In April 1994, Ms. Mary Simoneau, a Senior Disability Claim Consultant with Connecticut General, notified Mr. Uberti of his initial approval for disability benefits and waiver of quarterly premium. *See* Pl. 2 at L180. At the time of this initial eligibility determination, Ms. Simoneau did not indicate on what basis defendant had determined that Mr. Uberti was "totally disabled" and entitled to coverage under the policy. However, the nature of Mr. Uberti's illness or injury was listed as "Tear Lateral Meniscus." *See* Pl. 2 at L163. On August 26, 1994, Ms. Simoneau completed an income verification form for Mr. Uberti in connection with his application for a home mortgage reflecting that he would continue to receive his disability benefits for "as long as he remains totally disabled." Pl. 2 at L142. On September 7, 1994, Dr. Kiesel conducted the second orthoscopic surgery on Mr. Uberti's left knee discovering a partial tear of the medial meniscus and medial plica.[3] *See* Pl. 2 at L132.

Even after the second surgery and continuous physical therapy, Dr. Kiesel submitted a medical information form to Connecticut General indicating generally that Mr. Uberti's condition remained unchanged, and therefore plaintiff continued to receive benefits. In July of 1995, Ms. Simoneau sent a letter requesting clarification of some of the information contained

in this form, and seeking copies of Mr. Uberti's medical records. *See* Pl. 2 at L112. Information was apparently received, and Connecticut General continued to pay disability benefits.

Mr. Uberti also applied for Social Security disability benefits, pursuant to which an examination was conducted by Dr. Sahasra Naman, an internist. Pl. 2 at L40. Dr. Naman, in her Disability Examination Report dated October 27, 1995, related that "[p]atient claims his knee problems started in his early childhood" when Mr. Uberti was hit by a car and "his left knee was shattered in 8 different places," resulting in "several surgeries [ ] repairing his knee and left femur." Pl. 2 at L44. Dr. Naman also indicated that plaintiff was now experiencing some right knee pain, severe back spasms as well as "disabling agrophobia." Pl. 2 at L42. On May 6, 1996, Mr. Uberti was notified that he was entitled to monthly SSI benefits. Pl. 2 at L92.

At some point in May 1996, Ms. Cynthia Lavoie, another Connecticut General Senior Disability Claim Examiner, took over responsibility for Mr. Uberti's policy. She requested additional medical information from two of Mr. Uberti's treating physicians on July 15, 1996, although she apparently did not contact Dr. Kiesel, the orthopedist treating Mr. Uberti's knee. Pl. 2 at L86–87. Ms. Lavoie also sent a letter to Mr. Uberti on June 5, 1996 advising that she was arranging for him to undergo an Independent Medical Examination ("IME") with Intracorp, a private contractor. *See* Pl. 2 at L99. On June 16, 1996, Mr. Uberti telephoned Ms. McMahon at Connecticut General to explain that he

---

**3.** Testifying expert Dr. Eric Katz, an orthopaedic surgeon, differed with Dr. Kiesel as to the origins of this plica and whether it preexisted the 1994 injury, or was a by-product of the first post-injury surgery. If, as Dr.

Kiesel opined, it pre-existed plaintiff's 1994 fall, it was asymptomatic as there was no evidence of any functional inference with plaintiff's physically active lifestyle.

would be unable to undergo the IME in Florida at that time because he was caring for his ill father in Connecticut. He also provided information about his recent SSDI benefit award. Connecticut General agreed to postpone the IME until plaintiff returned to Florida. Pl. 2 at L96–98. Although Ms. Lavoie testified that she had intended to reschedule the IME, she never did so, and she conceded that she never asked Mr. Uberti at any subsequent time to undergo an IME.

Ms. Lavoie continued to receive medical information forms about plaintiff from his doctors.[4] Dr. Kiesel's office returned defendant's Disability Information Form IP–134, dated September 23, 1996, checking "yes" that Mr. Uberti was "totally disabled" from performing "patient's regular occupation," but checking "no" as to "any occupation," and simultaneously checking "physical impairment Class 5—Severe limitation of functional capacity; incapable of minimal (Sedentary) activity." *See id.* at L37.

On January 15, 1997, Ms. Lavoie wrote to Mr. Uberti:

> We have reviewed the medical information in file which indicates, you have been experiencing problems with your left knee since early childhood as a result of your left knee being shattered in 8 different places. You have undergone several surgeries on your left knee. [B]ased on the information in file, it does not appear that your claim for total disability beginning 2/7/94, resulted directly and independently of all other causes of accidental bodily injury sustained while the policy was in force, but rather a exacerbation of progressive degenera-

tive deterioration of your left knee which has been present and occurred from an incident in your early childhood. Therefore policy benefits will be paid according the maximum benefit period for disability classified as a sickness, which is 60 months.

*Id.* at L–32–33.

This was the first time Connecticut General informed Mr. Uberti that his benefits were paid for "sickness" and as such would terminate in March 1999 (sixty months). Ms. Lavoie invited Mr. Uberti to provide any additional information "you feel we should consider." *Id.* at L33. The information on the IP–134 dated August 28, 1997 submitted by Dr. Kiesel remained unchanged, i.e., that plaintiff had the most severe limitation and was totally disabled from his occupation, but not from any occupation. *See id.* at L28.

On January 1, 1998, Ms. Lavoie became an employee of Lincoln National, which had acquired plaintiff's policy from Connecticut General, and continued to be responsible for administering Mr. Uberti's policy. On July 27, 1998, Ms. Lavoie sent Mr. Uberti a copy of her January 15, 1997 letter and reiterated that she was giving him advance notice that his final payment would be March 9, 1999, the end of the five year indemnity period for "sickness" provided by his policy. *See* Pl. 2 at L23.

At plaintiff's counsel's request, Ms. Lavoie sent a complete copy of Lincoln National's medical file on September 23, 1998. *See* Pl. 2 at L19. Presumably prompted by counsel's letter and before sending the file, Ms. Lavoie sent a Claim Department Management Referral to her manager, stating that her evaluation "has determined the

---

4. In July 1996, Dr. Stefopoulos, a psychiatrist, provided Ms. Lavoie with his treatment notes and opinion letter that Mr. Uberti was suffering from a severe form of Panic Disorder with Agoraphobia and chronic depression. *See* Pl.

2 at L–73–83,85. This, however, seems not to have figured in any way into Ms. Lavoie's determination of the cause of plaintiff's disability.

insured claim is classified a sickness according to the terms and provisions of his policy." *See* Pl. 2 at L17. While her manager Cindi Peters responded that Mr. Uberti's claim "appear[ed] to be sickness as total disability is not resulting from accidental bodily injuries directly and independently of all other causes," she cautioned Ms. Lavoie that:

> You should get that fact [whether the abnormalities reflected in the SSI reports are related to the ligament tear] medically documented however—either by an addendum by Dr. Naman, an IME (by an ortho) or by his attending physician. We need to medically document that the I's [insured's] current disability (recent and on-going) is not directly and independently related to the ligament tear, but to the previous extensive injuries to the left knee. The ligament tear could be a contributing factor, but unless it is the *sole* factor for his current condition, this would be considered a sickness ... I do believe we need to clarify the direct cause of his total disability and that issue needs to be addressed by a doctor. You may want to have the claim evaluated by Dr. Huguenard for his medical opinion on causation."

Pl. 2 at L17–18 (emphasis in original).

Two months later, on November 17, 1998, Ms. Lavoie referred Mr. Uberti's file to Dr. Huguenard, a physician board certified in family medicine, but with no certification in orthopaedics, who was employed as the medical director at Lincoln National. By "Medical Team Referral Form" she checked the following areas for his response: "What conditions have been identified in the medical records? What is the prognosis for this claimant based on the medical information? What are the limitations and restrictions from the occupational duties. Evaluate the usefulness of and suggest examiner questions for an IME."

*See* Pl. 2 at L15. In addition, she hand wrote additional questions: Dr. Huguenard:

1. What is the direct cause of his disability beginning 2–7–94.

2. Was the 2/6/94 (slip on ice) incident directly and independently of all other causes the direct result of disability beginning 2–7–94.

3. Is the insured currently totally disabled from any occupation as a result of the 2–6–94 incident.

4. If not, is the insured currently totally disabled from any occupation as a result of any other conditions.

5. Do you think it would be valuable to obtain any further clarification from the IME Doctor or would an additional IME be helpful in clarifying the above.

Pl. 2 at L16.

By a Specialist Consultant Response Form dated November 19, 1998, Dr. Huguenard addressed only some of Ms. Lavoie's questions. He based his responses solely on his review of the medical file defendant maintained, expressly noting that there were no records more recent than August 27, 1997. Dr. Huguenard opined that "it appears that the limitations and restrictions stem from conditions that may have been aggravated in a February 1994 accident, but the underlying conditions contributing to his left knee problem were undoubtedly present well before 1994" *See* Pl. 2 at L10–11. Dr. Huguenard also recognized that there were deficiencies in the medical record used as the basis of his opinion because he recommended that:

> we update all medical records and obtain physician statements from all physicians who continue to treat the claimant. After these are obtained and evaluated, assessment of the claimant's current

medical condition and the utility of an IME in filling in any missing pieces could be made. I will be happy to discuss further with you.

*See id.*

However, Ms. Lavoie did nothing further to update Mr. Uberti's medical records, did not request an IME and did not press for any medical opinion on the crucial causation issue, notwithstanding the recommendations of both Ms. Peters and Dr. Huguenard. Moreover, Ms. Lavoie never even spoke with Dr. Huguenard nor sought answers to her five specific, highly relevant questions. Instead, on February 25, 1999, Ms. Lavoie simply wrote to Mr. Uberti reiterating that his benefits would be discontinued effective March 9, 1999 since:

> Based on the information in file, it does not appear that Mr. Uberti's claim for total disability beginning 2/7/94, resulted directly and independently of all other causes of accidental bodily injury sustained while this policy was in force. It appears the Insured's limitations and restrictions stem from conditions that m[a]y have been aggravated in February 1994 accident, but the underlying conditions contributing to his left knee problems were undoubtedly present well before 1994. Therefore as stated previously, policy benefits will be paid according to the maximum benefit period for a disability classified as sickness, which is 60 months.

Pl. 2 at L7.

On March 5, 1999, Ms. Lavoie sent Mr. Uberti a letter enclosing his final benefit check and advising that his waiver of premium would now cease. Pl. 2 at L4.

## CONCLUSIONS OF LAW

### 1.  Breach of Contract Claim

In Count One, Mr. Uberti seeks recovery of the $450 per month disability bene-fit he claims he is entitled to under the terms of his insurance policy. Under Connecticut law, "construction of an insurance contract presents a question of law for the court." *Aetna Life & Cas. Co. v. Bulaong,* 218 Conn. 51, 58, 588 A.2d 138 (1991). The terms of an insurance policy must be interpreted according to the same general rules that govern contract construction. *See Schultz v. Hartford Fire Ins. Co.,* 213 Conn. 696, 702, 569 A.2d 1131 (1990). The determinative question concerns the intent of the parties, "that is, what coverage the [plaintiff] expected to receive and what the defendant was to provide, as disclosed by the provisions of [the] policy." *Marcolini v. Allstate Ins. Co.,* 160 Conn. 280, 283, 278 A.2d 796 (1971). Where the terms of an insurance policy are clear and unambiguous, the contract language must be accorded its natural and ordinary meaning. *See Heyman Associates No. 1 v. Insurance Co. of State of Pa.,* 231 Conn. 756, 770, 653 A.2d 122 (1995).

Therefore, the first step is to consider the operative language of the Policy which provides benefits if the Insured becomes "totally disabled, as defined," during which period of total disability Lincoln National waives its premium.

The Policy defines "total disability" as follows:

> **Total Disabilities Defined.** The Insured will be considered to be totally disabled, if, as a result of sickness contracted and commencing while this policy is in force, or as a result directly and independently of all other causes of accidental bodily injuries sustained while this policy is in force, he becomes wholly and continuously disabled and completely prevented from performing the duties of his occupation and requires the regular care and treatment by a physician other than himself, provided that after

such total disability has continued for a period of sixty months the Insured will be considered to be totally disabled only so long as he remains wholly and continuously disabled and completely prevented from engaging in any occupation or employment for which he is qualified or may reasonably become qualified by education, training or experience. Pl.Ex. 1 at p. 5. The policy also provides that certain disabilities are deemed to be "sickness," within the meaning of the policy, if the disability "(a) results from injuries caused or contributed to by disease." *Id.*

The distinction between whether a disability results from accidental bodily injuries or sickness is relevant to this case because the "Policy Specifications" provide a maximum indemnity period of 60 months for "sickness" and lifetime for "injuries." Pl. 1 at p. 2. Since it is undisputed that Mr. Uberti has already been paid full benefits for the first sixty months of his total disability claim arising from his torn menisci (from March 1994 through March 1999), the issue is whether defendant breached its contract of insurance and duty of good faith and fair dealing when it terminated his benefits beyond that date, after concluding that his disability did not result "directly and independently of all other causes of accidental bodily injury sustained" while the policy was in force, but was instead an "exacerbation of progressive degenerative deterioration of [his] left knee which has been present and occurred from an incident in [his] early childhood." Pl. 2 at L25 (letter terminating benefits).

■ The phrase "as a result directly and independently of all other causes of accidental bodily injuries" has been subject to interpretation by numerous courts, including the Connecticut Supreme Court. In the context of a life insurance policy providing a double indemnity benefit if the insured's death was caused by an accident, the Connecticut Supreme Court noted that in past cases involving similar policy language it had "required the claimant under the policy to prove, by a preponderance of the evidence, that the insured was the victim of an accident and that the accident was the sole cause or sole proximate cause of the insured's death or bodily injury, independently of all other causes." *Ellice v. INA Life Ins. Co.*, 208 Conn. 218, 544 A.2d 623 (1988). While the court acknowledged that the mere presence of a preexisting illness or disease does not, in and of itself, automatically preclude recovery under the type of policy provision in question, "the plaintiff must prove, by a preponderance of the evidence, that the decedent died directly from an injury sustained in an accident ... and that there were no other causes contributing to his death." *Id.* at 227–28, 544 A.2d 623; *see also Culhane v. Aetna Life Ins.*, 124 Conn. 237, 199 A. 103 (1938) (employing same analysis in context of disability policy; affirming trial judge's conclusion that injuries leading to disability "came about wholly through accidental means, and ... were not caused indirectly or partly by reason of any pre-existing disease"). The Court will accordingly utilize this controlling interpretation of the policy language in determining whether Mr. Uberti has met his burden.

As noted above, the basis for defendant's denial of Mr. Uberti's claim for benefits beyond sixty months is Lincoln National's contention that Mr. Uberti's disability resulted from "sickness," or more specifically, a disability deemed to result from "sickness" under the policy because it "result[ed] from injuries caused or contributed to by disease." At trial, Ms. Lavoie clarified that the disease she claims caused or contributed to Mr. Uberti's current disability was the "condition" resulting from

his left knee injury in the 1952 childhood accident.

■ Plaintiff's unrebutted evidence demonstrated that he had been physically active and fully employed prior to the 1994 accident, and that he became totally disabled by the pain and left knee dysfunction, a disability which was not remedied by knee surgeries and attempted rehabilitation therapies. Ms. Lavoie and Dr. Huguenard, the Medical Consultant employed by Lincoln National, hypothesized that the 1994 injury aggravated Mr. Uberti's preexisting knee condition, but that "the underlying conditions contributing to his left knee problem were undoubtedly present well before 1994." Pl. 2 at L12. However, in the opinion of Dr. Kiesel, plaintiff's most recent orthopaedic surgeon, plaintiff's current disability "stemmed 100% from the injury of February of ... <94." Pl. 5 at 21. He also emphasized that plaintiff's knee had not been "shattered in 8 different places" when he was injured in his childhood, contrary to Naman and then Lavoie's recitation; rather, he had suffered an injury to his femur, a "shaft injury," that did not affect the knee, to the best of his knowledge. Pl. 5 at 49. His opinion was based on considerations that "from the time of the childhood injury until the time he was injured ... he had no history of any pain or disability, to my knowledge, that he was able to play sports as vigorous as racquetball regularly and that he held on to a full-time job as a construction worker without any complaints ... that everything changed after that [1994] injury and the findings that I saw in my orthoscopic exam were consistent with recent injury." Pl. 5 at 20–21. Dr. Kiesel also opined that although he saw significant abnormalities in the left knee when he conducted the second arthroscopic surgery, these problems were the result of the traumatic injury, and that only a patel-la femoral groove could possibly be attributed to the childhood injury. Pl. 5 at 16–17. The lab tests that were conducted on the cartilage shavings from Kiesel's surgery diagnosed "degenerative changes consistent with medial meniscus tear." Pl. 3 to Kiesel Dep. (Pl.5).

He further opined that plaintiff was "completely restricted and totally disabled" because he could not carry weight, do repetitive motions with his feet and legs, and could not walk well, Pl. 5 at 64–65, and that because his knee was "very painful and disabling to him," he was disabled from all work. Pl. 5 at 65. Although Dr. Kiesel had originally thought there "might be some sedentary job that he might be able to be retrained for," the more he observed plaintiff's lack of medical progress, the clearer he came to understand "how much pain and disability he was actually having," and he ultimately concluded that "he was not fit to go back to work." Pl. 5 at 61–62.

Dr. Katz concurred that plaintiff had not been functionally disabled prior to February 1994, and that the 1994 left knee injury was the direct and independent cause of his total disability, independent of all other causes. Dr. Katz gave Dr. Kiesel and Dr. Naman's opinion as to the degree of the plaintiff's disability and the cause of that disability a great deal of deference because they were the treating physicians, and had "been inside Mr. Uberti's knee." Katz Test. at 78. He did not, however, give a "tremendous amount of credibility" to Dr. Naman's report to SSI, because she was an internist who did not deal with orthopedic issues. *Id.* at 87. Dr. Katz also relied on the facts that Mr. Uberti had been fully employed and physically active prior to the February 1994 accident, and had never sought treatment for left knee symptoms prior to the injury as support for his conclusion. Katz Test. at 32–33. Katz testi-

fied that osteoarthritis, a condition with which plaintiff had been diagnosed by Dr. Kiesel, can stem from a traumatic injury or can develop as a result of genetic disposition or chronic wear and tear on the joints. *Id.* at 47. While Katz acknowledged that different leg lengths could cause some wear and tear on the knee joints, and that the malignment of Mr. Uberti's patella probably resulted from the childhood trauma, he still maintained that the fall was a "major role" in Mr. Uberti's disability, and declined to speculate as to what role his underlying conditions played in his disability. *Id.* at 82. He also testified that he did not believe that Mr. Uberti's previous right knee problems, identified in the medical records as occurring in 1984, had anything to do with the condition of his left knee and his disability, and that in his opinion, the childhood injury only resulted in the difference in the lengths of Mr. Uberti's legs. Katz Test. at 93. As a matter of reasonable medical probability, he agreed with Dr. Kiesel that Mr. Uberti was disabled directly and independently of all other causes as a result of the February 1994 injury. *Id.*

Defendant offered no rebuttal expert medical testimony at trial. Defendant's only medical opinion on causation was Dr. Huguenard's response to Ms. Lavoie's inquiry, listing " . . . conditions . . . that have been identified in the medical records with relevance to disability," and his conclusion that " . . . the limitations and restrictions stem from conditions that *may have been* aggravated in a February 1994 accident, but the underlying conditions contributing to his left knee problem were undoubtedly present *well before 1994*." (emphasis added). Pl. 2 at L10–11. At trial, Dr. Huguenard relied on medical records describing a 1984 injury and arthroscopic surgery to plaintiff's right knee to support this conclusion. He testified that these records indicated Mr. Uberti had sought treatment

for his left knee, and also suggested a chronic knee problem. From this Court's review of the records, however, they indicate only a previous complaint about the right knee and the left ankle, as well as problems with his left thigh. *See* Pl. 2 at L168–171. Dr. Hueguenard seems to have focused on every reference to "chronic" conditions in the plaintiff's records, as well as every treatment to his lower extremities that plaintiff ever sought. His contention that plaintiff previously sought treatment for his left knee is belied by the fact that the reference in the medical records to "lt knee" is clearly a transcription error, occurring as it does two weeks after an entry describing treatment to plaintiff's "rt knee" and requiring a return visit in two weeks. *Id.* at L171. Huguenard also stated that he was board certified in family medicine, not in orthopedics, and that he had familiarity with joint musculo skeletal injuries only through his work in student health services at a university, where he treated some sports injuries. Huguenard Test. at 45.

Ms. Lavoie testified that she determined that his condition was a "disease," but she was equivocal regarding her knowledge of his medical records and inconsistent in her recollection of events. She could not recall the basis for her conclusion that Mr. Uberti suffered from a "progressive degenerative deterioration" of the knees, Lavoie Test. at 39, and was under the impression that plaintiff's left *knee* had been shattered in eight places, as a result of the childhood injury. *Id.* at 43. As Dr. Kiesel clarified, however, plaintiff's childhood injury was to the femur, not the knee, and to the best of his knowledge, did not affect the knee in any way. Pl.Ex. 5 at 49. The laboratory tests conducted after the surgery are also consistent with a conclusion that any degenerative condition suffered by Mr. Uberti was a result of the meniscal tear, not

any preexisting condition. Ms. Lavoie also engaged in the same misreading of the medical records as Dr. Huguenard, and insisted that plaintiff had received treatment for his left knee in 1984, even though she acknowledged that every other entry on the relevant page referred to the right knee. Lavoie Test. at 58. She acknowledged that neither she nor Huguenard had any medical records contemporaneous with the childhood injury, and that she never obtained an independent medical evaluation of Mr. Uberti, despite the recommendation of Peters and Dr. Huguenard. *Id.* at 70–71.

Ms. Lavoie testified that she determined that his condition was a "disease," but she clearly did so without the recommended independent medical examination which would assess plaintiff's current medical condition, without the recommended physician statements from plaintiff's treating doctors, without adequate medical opinion or authority, and absent medical records of any medical treatment for left knee complaints. Notwithstanding these deficiencies in the claim examination process, she concluded that Mr. Uberti's disability was the result of "sickness" and thus he was entitled to only a 60 month indemnity period, because his disability resulted from injuries "caused or contributed to by disease," i.e., the post–1952 accident and resulting medically compromised condition. In essence, defendant itemized all of plaintiff's pre-existing medical conditions, which had not been previously disabling (or bore no relationship to the current left knee disability, such as "symptoms involving the right knee," "chronic low back pain of a musculoskeletal strain or mechanical origin," "history of panic disorder with agoraphobia and accompanied by depression"), Pl. 2 at L6–7, and concluded that these conditions were aggravated by the 1994 accident and meniscal tears. While Dr. Naman's notation in the Disability Examination report that plaintiff's knee had been "shattered in 8 different places" was enough to prompt further investigation into the cause of plaintiff's disability, there is no medical evidence to demonstrate any causal connection between the childhood injury and Mr. Uberti's current knee problems, save Dr. Huguenard's non-orthopedic review of the claim file.

Ms. Lavoie acknowledged that none of the various preexisting conditions contributed in any way to the torn menisci, and that a torn menisci was not a "disease" within the meaning of the policy, but she nonetheless characterized his disability as a disease, apparently due to nothing more than the references in his medical records to previous leg injuries, and Dr. Naman's mistaken description of the exact location of those injuries. Her reliance on the internist's misstatement is demonstrated by the fact that she quotes Dr. Naman's language exactly in her January 1997 letter explaining that Mr. Uberti's disability would be deemed to result from sickness. *See* Pl. 2 at L25. Perhaps her supposition of a connection was logical, based on the evidence she had before her, but she needed to do more than simply rely on what could be anatomical coincidence in order to bear out this conjecture and deny benefits. Both Peters and Huguenard recognized that medical documentation and independent examination were necessary to demonstrate the causal link, but Lavoie dispensed with this requirement, despite her lack of medical training and a provision in the claims reference guide instructing examiners that the provision deeming certain disabilities as sickness was not intended to "medically change an accidental injury into a sickness." Lavoie Test. at 75. Despite the lack of sufficient medical evidence in the file to support her conclusion of causation, she did not update the medical records as suggested by Dr. Huguenard, nor

did she clarify "the direct cause of his total disability" with a doctor, specifically an orthopedist, as suggested by Peters. Pl. 2 at L18. Most tellingly, she did not contact Mr. Uberti's treating orthopedist, Dr. Kiesel.

The Court finds that plaintiff has met his burden of proving that he was disabled solely as the result of his 1994 accident and torn left knee menisci, and that his childhood orthopaedic condition did not cause or contribute to his disability. Plaintiff was fully functioning before February 1994, despite the physical limitations and conditions resulting from the 1952 accident. The unrebutted medical testimony was that Mr. Uberti's current disability arose directly as a result of tearing his menisci after falling or being kicked in February 1994 and that such disability was wholly independent of any other accidental bodily injuries sustained by Mr. Uberti while this policy was in effect. While on cross-examination Dr. Katz testified that an individual with no preexisting leg injuries may recover from a less severe knee injury more quickly than had Mr. Uberti, there was no evidence that his previous injuries rendered him an "eggshell skull claimant," in that he was incapacitated by what would have been a relatively minor injury to a healthy individual. Dr. Kiesel in his deposition declined to speculate as to the "normal time of recovery" for such a severe knee injury, Pl. 5 at 59, and the lab tests conducted after Kiesel's surgery supported his and Katz' conclusion that any degenerative condition was the result of the meniscus tear.

In fact, the medical records are bereft of evidence that prior to the February 1994 injury Mr. Uberti suffered from diagnosed "disease" at all, such that it contributed to his recovery time or to the extent of his disability. While the internist's dramatic reference to Mr. Uberti's knee being "shattered in 8 different places" after his childhood injury obviously caught the attention of both Lavoie and Huguenard, even Dr. Naman does not venture an opinion as to any causal connection between the injury forty years previous and Mr. Uberti's current condition. Instead, both orthopedists who examined Mr. Uberti and who testified at trial, either live or via deposition, concluded that the February 1994 injury was the sole cause of his disability. Defendant did not rebut these conclusions with conflicting medical testimony, nor did it provide any grounds for disregarding or disbelieving the testimony of Kiesel and Katz. To contradict the treating physician's conclusions defendant only presented the testimony of Huguenard and Lavoie, and neither of these individuals had the qualifications or the knowledge to opine credibly on the cause of Mr. Uberti's current disability.

■ Although his childhood injury and subsequent surgeries were referenced by numerous doctors in deciding the course of treatment for his current knee injury, it is a settled principle of insurance law that a pre-existing condition does not prevent recovery on an accident policy if the accident still would have happened even absent the disease, "largely based on the principle that the parties cannot be assumed to have intended that a[ ] indemnity provision apply only in case the insured is in perfect health at the time of the accident." Couch on Ins. § 141:11 (3d ed.). *See also Rinaldi v. Prudential Ins. Co.*, 118 Conn. 419, 172 A. 777 (1934) (recovery was proper under life insurance policy provided for double indemnity benefit only if death results, "directly and independently of all other causes" from accidental injury, because "[e]ven in cases where the insured is afflicted at the time of the accident with some bodily disease, if the accidental injury be of such a nature as to cause death

solely and independently of the disease, liability exists"). The preexisting condition here was shown to have played no role in Mr. Uberti's disability, and only is referenced in the medical records as an aspect of Mr. Uberti's medical history, and accordingly his disability should not have been deemed to be the result of "sickness" under the language of the policy.

Defendant urges *Button v. Connecticut General Life Ins.*, 847 F.2d 584 (9th Cir. 1988) on the Court as persuasive precedent, but that case is easily distinguished from the facts of the case at bar. The claimant in *Button* had suffered from "recurring back problems" prior to the inception of the policy and the accident that triggered the coverage dispute, and it was undisputed that he suffered from degenerative disc disease. *Id.* at 585. Applying Arizona law, the Ninth Circuit affirmed the district court's grant of summary judgment, because "[t]here [was] no testimony that indicate[d] that the accident caused Button's disability independent of the preexisting disc problem." *Id.* at 586. In contrast here, two separate orthopedists have offered their opinion that plaintiff's disability was caused only by the February 1994 injury, and it is the insurer who has failed to provide any conflicting evidence demonstrating that the prior injury had any impact on the disability. Ms. Lavoie's conjecture and her lay review of the rec-

ords cannot serve to rebut the unswerving testimony of two specialists who examined the plaintiff, one of whom actually performed the surgery and went "inside Mr. Uberti's knee," and accordingly plaintiff has met his burden of showing he is disabled by an injury rather than a "sickness" within the meaning of the policy.

■ Plaintiff has also proved by a preponderance of the evidence that he was "totally disabled." Total disability is defined under the Policy as "wholly and continuously disabled and completely prevented from engaging in any occupation or employment for which he is qualified or may reasonably become qualified by education, training or experience." [5] Based on the testimony of Dr. Katz, Dr. Kiesel, as well as that of Mr. and Mrs. Uberti, the Court finds that plaintiff was and remains "totally disabled" within the meaning of the policy. Mr. Uberti testified about the pain he endures, which is exacerbated by having to sit for longer than a half an hour, and his need to elevate and ice his knee. In fact, the Court personally observed Mr. Uberti's significant discomfort, difficulty in sitting still and constant body repositioning, while testifying, corroborated by his further testimony the next day that after the trial day, he had to rest in a recliner while icing his knee for the duration of that day. Dr. Katz and Dr. Kiesel

**5.** Plaintiff took the position at trial that Lincoln National has the burden of pleading, as a special defense, that Mr. Uberti does not qualify for benefits because he is able to perform other occupations, reasoning that since the defendant failed to plead such a special defense, plaintiff does not have to prove that he is unable to perform any other occupation. Plaintiff's reliance on *Harty v. Eagle Indemnity Co.*, 108 Conn. 563, 565, 143 A. 847 (1928) is misplaced and the Connecticut Supreme Court has rejected this proposition. "[I]n the insurance context ...a contract, under the guise of waiver, [may not] be reformed to create a liability for a condition specifically excluded by the specific terms of the policy." *Heyman Associates No. 1 v. Insurance Company of State of Pennsylvania*, 231 Conn. at 777, 653 A.2d 122. *Harty* is most reasonably interpreted as concluding that a plaintiff need not prove compliance with all procedural conditions precedent to filing a claim. *See Harty*, 108 Conn. at 567, 143 A. 847. It is a matter of settled law that the insured bears the burden of demonstrating that the loss suffered falls within the terms of the policy, and as such the existence of coverage is an essential element of plaintiff's claim. *See Downs v. Nat'l Cas. Co.*, 146 Conn. 490, 152 A.2d 316, 319 (1959).

testified about plaintiff's physical capabilities and limitations on the basis of which the Court finds he was and continues to be wholly disabled and completely prevented from engaging in any occupation or employment for which he is qualified or may reasonable become qualified by education, training or experience.

Notwithstanding Lincoln National's suggestions that Mr. Uberti could obtain employment such as a telephone marketer or computer operator, so that he could remain seated, and, possibly work part-time, the Court finds no evidence that Mr. Uberti could find a job or obtain retraining that would accommodate his current pain condition and extreme physical limitations. While Lincoln National contends his current ability to fish and engage in activities on certain days and for limited periods suggests his ability to work, the Court finds such activities are not reflective of his ability to meet the on-going daily requirements of maintaining regular full-time employment. Lincoln National also suggests that Mr. Uberti might be able to alleviate his pain by engaging in physical therapy and losing some of the weight he has gained following his disability-related physical inactivity. This overlooks Mr. Uberti's previous unsuccessful attempts to do this and the aggravated pain physical therapy has caused. At this time, it is clear that Mr. Uberti remains and continues to be totally disabled. Even Dr. Huguenard's response to Ms. Lavoie specifically noted Dr. Kiesel's conclusion that plaintiff was "incapable of sedentary activity" (P. Exh. 2 at L–0011), and offered no contrary view.

Having determined that plaintiff has been "totally disabled" solely as a result of the February 1994 accident, the Court finds that termination of his benefits after March 1999 breached his contract of insurance. Accordingly, on Count One, Mr.

Uberti is entitled to retroactive benefits (23 months from April 1999 to March 2001, at a rate of $450 per month) of $10,350, plus $1,035 pre-judgment interest under Conn. Gen.Stat. § 37–3a for monies wrongfully withheld from the date they were due to be paid. He is also entitled to retroactive waiver of premiums, thereby reinstating the policy and obligating defendant to pay plaintiff $450 monthly benefit for so long as he remains "totally disabled" under the policy.

### 2. Breach of Covenant of Good Faith and Fair Dealing

In Count Three, Mr. Uberti alleges that Lincoln National's unreasonable conduct in its investigation and determination that his benefits were limited to the sixty month maximum indemnity period governing "sickness" breached the implied warranty of good faith and fair dealing implied in his insurance coverage.

In *Buckman v. People Express, Inc.*, 205 Conn. 166, 530 A.2d 596 (1987), the Connecticut Supreme Court recognized that insurance contracts, like other contracts, carry with them a common law implied covenant of good faith and fair dealing. In *Buckman*, the trial court had charged the jury that:

> good faith and fair dealing mean an attitude or state of mind denoting honesty of purpose, freedom from intention to defraud and generally speaking means faith to one's duty or obligation . . . . Bad faith is . . . the opposite of good faith, generally implying a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties."

*Buckman*, 205 Conn. at 171, 530 A.2d 596. Determination of what constitutes bad faith must be determined on a case-by-

case basis. *See Verrastro v. Middlesex Ins. Co.*, 207 Conn. 179, 190, 540 A.2d 693 (1988).

█ Insureds in Connecticut can expect that insurers will reasonably and adequately investigate claims before denying coverage. *See, e.g.,* Conn. Gen.Stat. § 38a–816(6) (defining an unfair claim settlement practice as "(d) refusing to pay claims without conducting a reasonable investigation based upon all available information."). While evidence of a mere coverage dispute or mere negligence in an investigation will not demonstrate a breach of good faith and fair dealing, an insurer may not cut off benefits on the basis of unsupported determinations resulting from its arbitrary failure or refusal to properly perform the claims examination function.[6]

█ The Court finds that Lincoln National's senior claims examiner conducted no "investigation" of the cause of Mr. Uberti's disability other than personally reading the collected records, forms and physician notes that were contained in her file on plaintiff. She possessed no medical education or specialized training that would allow her to make medical determinations, particularly on something as crucial as causation.[7] Mr. Uberti's claim for disability was not initially classified as one resulting from sickness, and defendant's internal memorandum of August 1994 indicates no benefits limitation for sickness, but that benefits would continue for as long as Mr. Uberti remained totally disabled. While the information in the medical records regarding Mr. Uberti's previ-

ous injuries may have properly prompted additional investigation into the cause of his disability, Ms. Lavoie seized upon isolated references in the medical record and her own misinterpretation of those records' significance in reaching her conclusion, and could not be swayed from that position. More than two and one half years after Mr. Uberti's claim was filed, without the IME Ms. Lavoie had previously thought was necessary when she took over the claim, and without any medical opinion that more likely than not plaintiff's total disability was not caused by the 1994 injury, and contrary to a fair reading of treating orthopaedic surgeon Dr. Kiesel's record, Ms. Lavoie "determined the insured claim is classified a sickness according to the terms and provisions of his policy." P. 2 at L17. She never asked the treating specialist Dr. Kiesel whether her conclusion was medically accurate, although in the past she had asked for additional information from Mr. Uberti's other treating doctors, such as his psychiatrist and a cardiologist. *See* Pl. 2 at L86–87. Nor did she follow up with Dr. Huguenard for his opinion, or obtain one from an independent examining physician.

An insured is entitled to expect that a claim examination will include, as part of a reasonable and adequate investigation, consideration of the relevant opinions of the treating physician where a medical issue is unclear or controverted, or consideration of the opinions of an independent physician from the appropriate speciality before deciding to terminate benefits on

---

**6.** In fact, some lower courts in Connecticut have described the relationship between insurer and insured during the period that a claim is being processed as a fiduciary one. *See, e.g., Farricielli v. Nationwide Mutual Fire Ins. Co.*, No. 328028, 17 Conn. L. Rptr. 368 (Conn.Super. Aug. 13, 1996). Other courts, however, have limited the situations in which fiduciary-like duties may be imposed on an

insurer, particularly to those involving third-party claims. *See, e.g., Grazynski v. Hartford Ins. Co.*, No. CV960337594, 1997 WL 407897 (Conn.Super. July 11, 1997).

**7.** Ms. Lavoie vaguely testified to having taken at least one medical related course at some point in the 1980s or 1990s.

the basis of a medical conclusion. The reference guide for the claims examination process further demonstrates that examiners such as Ms. Lavoie were not to "medically change" accidents into sickness, but that appears to be precisely what she did. Lavoie Test. at 75. Equivocal in-house physician statements like Dr. Huguenard's which do not contain a reasoned, supported, clear medical opinion on the problematic medical issue—here causation—cannot alone serve this function. Nor can Ms. Lavoie's conjecture alone as to the cause of Mr. Uberti's disability provide a sufficient basis for a claim denial, and still be consistent with the duty of good faith and fair dealing.

Further, the Court did not find Ms. Lavoie to be an entirely credible witness. Her conclusory answers did not suggest an effort at sound reasoning or a rationale for the decisions she made during the course of denying Mr. Uberti's claim, either in policy language application or in the substance of her record review, and consisted largely of her mantra that she reviewed the entire record for disability under the terms of the Policy. It is evident to the Court that Ms. Lavoie reviewed the medical records unaided by any medically trained person, and seized upon notations such as "atrocious knees," "supercondylar fracture of [L] knee," "loosening of the medial collateral ligament . . . chronic," "very strange patello femoral groove," "plica," "strange wear pattern," and "osteoarthritis," coupled with the shortened left leg, back pain and patella malalignment to reach her conclusion. In effect, she diagnosed Mr. Uberti on her own as suffering from progressive deterioration of his left knee as a result of the 1952 accident, which deterioration was exacerbated by the 1994 accident, thereby constituting disability caused by "sickness," despite the lack of any medical diagnosis as to the exact nature of that "sickness," or whether plaintiff was suffering from any condition at all. Pl. 2 at L32–33.

Had Ms. Lavoie investigated beyond the collected records and forms to obtain Dr. Kiesel's opinion, the result would have been different, given Dr. Kiesel's deposition testimony. Further, the Court concludes that based on Dr. Katz' testimony at trial, an independent medical examiner would likely have reached the same conclusion, and informed Lincoln National that the Mr. Uberti's disability was directly, and independently of all other causes, the result of the February 1994 accident. Had Ms. Lavoie taken either of these two additional steps—steps required by both her supervisor and the medical consultant on whose opinion she otherwise relied—Mr. Uberti's severe disability would not have been "deemed" sickness in such a cursory manner, but would have instead been revealed to be the sole product of his 1994 injury. But rather than taking these steps, the record demonstrates that Lincoln National relied exclusively on Ms. Lavoie's opinion, notwithstanding her lack of medical expertise and the inadequacies of the records, to deny Mr. Uberti benefits after March 9, 1999.

The claims file itself contained physician forms with cryptic, sometimes contradictory information, no independent medical examination results and no clarifying medical opinion on causation despite her supervisor's instructions. From these facts, the Court concludes that Lincoln National's determination that plaintiff's disability was the result of "sickness" was an arbitrary medical determination made by an unqualified claims examiner whose opinion was unsupported by the medical record, and directly contradicted by the opinions of Mr. Uberti's treating physician in the pertinent specialty. This arbitrary conduct was more than negligence or honest mistake, given that both Ms. Lavoie's supervi-

sor and the one medical expert she consulted recommended further investigation, and was in stark dereliction of the insurer's duty to fairly and reasonably investigate a claim and make a coverage decision based on all available and current information. Accordingly, the Court finds that Lincoln National breached it duty of good faith and fair dealing when it terminated plaintiff's benefits after March 9, 1999.

■] Having concluded that Lincoln National has breached the implied covenant of good faith and fair dealing, the Court must determine what amount of damages, if any, are appropriate. The trial evidence clearly demonstrated that Mr. Uberti suffered significant and severe emotional distress as a result of Lincoln National's bad faith. Mr. Uberti's testimony established that he long ago purchased the insurance policy on the advice of his father-in-law to safeguard against, "God forbid," something happening such that he became disabled and unable to support his family, and he was assured that the policy would pay him. Mr. Uberti described his initial sense of inadequacy when he became totally disabled and unable to work, but he also testified about how angry and upset he became when he then learned that his benefits were terminated because of an incomprehensible decision that he was deemed disabled by "sickness": "I didn't understand what they were talking about—it didn't make any sense." While Mr. Uberti did not extensively testify about the extent of his suffering, his few words and general demeanor and affect expressed how angry, cheated and depressed he felt because he had faithfully paid his premiums all along for just this eventuality, yet was now unable to protect his family as planned. An indication of the impact Ms. Lavoie's summary termination of disability benefits had on the Uberti family and Mr. Uberti's sense of self-worth can be seen in the fact that his benefit would have paid approximately two thirds of the Uberti's monthly mortgage payment.

The nature and consequences of his reaction to the benefits termination was amplified by the testimony of his wife Gail Uberti, who has known the plaintiff since she was a cheerleader and he was a varsity linebacker in high school. Ms. Uberti credibly described how the benefits termination had deeply affected her husband over the last seventeen months. She reluctantly but candidly revealed how, upon receiving Mr. Lavoie's letter that his benefits were terminated, Mr. Uberti became more irritable, withdrew from social engagements, slept more than ten or twelve hours a day, watched television alone, did not leave his home for extended periods of time, no longer had sexual relations with her and, sadly, was "no longer my friend." While Mr. Uberti clearly suffered depression after becoming disabled and failing to recover, the trial evidence demonstrated that this reactive depression was augmented in quality and quantity by the unexpected termination of the benefits on which he had counted and for which he paid his premiums for over 20 years. His wife succinctly described the reason for his severe reaction to this income cutoff: "He's Italian, he's macho, he couldn't support his family. It took away his manhood."

In determining what amount of damages is appropriate, the Court has considered the nature and length of Lincoln National's breach and its effect on Mr. Uberti's sleep, sense of security, social relations and marital relationship. The Court concludes that a compensatory damages award of $75,000 is merited for the emotional distress and attendant physical symptoms caused by Lincoln National's breach of duty of good faith and fair dealing. Similar symptoms experienced over a shorter period of time

warranted an award of $35,000 almost fifteen years ago in *Buckman v. People Express, Inc.*, 205 Conn. at 177, 530 A.2d 596, and the Court finds that $75,000 is an appropriate remedy in the present circumstances.

### 3. Punitive Damages

■ Mr. Uberti also seeks his costs and expenses in this action including a reasonable attorney's fee under Count Three. Under Connecticut law, punitive damages, unless otherwise abrogated by statute, *see, e.g.,* Conn. Gen.Stat. § 42–110(g) (interpreted by courts as permitting punitive damages to also incorporate deterrence), are limited to an amount which will serve to compensate the plaintiff to the extent of his expenses of litigation less taxable costs. *See L.F. Pace & Sons, Inc. v. Travelers Indemnity Co.,* 9 Conn.App. 30, 47, 514 A.2d 766 (1986). While punitive damages are not ordinarily recoverable in a simple breach of contract case, in *Triangle Sheet Metal Works, Inc. v. Silver,* 154 Conn. 116, 222 A.2d 220 (1966), the Connecticut Supreme Court first recognized there exists a small subset of contract cases involving elements of torts in which punitive damages may be awarded. Nonetheless, in *Triangle Sheet Metal,* the Connecticut Supreme Court reversed the award of punitive damages against former employees who had misappropriated their employer's trade secrets where there was no allegation nor evidence that the employees were motivated, intended or designed to harm their former employer. 154 Conn. at 128, 222 A.2d 220. Subsequently, in *L.F. Pace,* 9 Conn.App. at 48, 514 A.2d 766, the Connecticut Appellate Court recognized that common law punitive damages may be awarded on a claim for breach of a surety contract so long as there is proved an underlying tort or tortious conduct, and the tortious conduct is alleged in terms of wanton or malicious injury, evil motive, outrageous conduct or reckless disregard to the interests of others. Accordingly, Connecticut common law does not preclude an award of punitive damages where the insurer's conduct is found to be malicious or outrageous, that is, done with bad motive or reckless disregard of, or indifference to, the plaintiff's rights. *Compare Barry v. Posi–Seal International, Inc.,* 40 Conn.App. 577, 672 A.2d 514 (1996) (finding punitive damages cannot be awarded based on breach of implied covenant of good faith and fair dealing in employment contract distinguishing relationships between employee/employer and insured/insurer).

While the Court finds Lincoln National breached its implied covenant of good faith and fair dealing, the Court does not find an evidentiary basis for an award of punitive damages in this case. The plaintiff's proof that Lincoln National's unreasonable action was the result of an arbitrary and unsupported determination based on a known inadequate investigation and inconsistent with the policy language, while sufficient to prove bad faith, does not contain sufficient indicia of bad motive, wantonness, or outrageousness to warrant imposition of punitive damages.

### CONCLUSION

Having determined that Mr. Uberti was "totally disabled" since March 1999 and remains so and that Lincoln National breached its covenant of good faith and fair dealing, judgment will enter in favor of Mr. Uberti and against defendant Lincoln National on Count One in the amount of $11,385, representing past benefits owed from March 9, 1999 to March 2001, with prejudgment interest, and monthly payments of $450 to commence April 2001, under plaintiff's reinstated policy for so long as he remains totally disabled, and judgment will enter in favor of Mr. Uberti

and against defendant Lincoln National on Count Three in the amount of $75,000.

IT IS SO ORDERED.