YALE UNIVERSITY

v.

CIGNA INSURANCE CO., et al.

No. Civ.A. 3:97 CV 2341(SRU).

United States District Court,
D. Connecticut.

July 16, 2002.

William J. Doyle, Wiggin & Dana, Steven Berglass, Sloan W. Farrell, John W. Sullivan, Seeley & Berglass, New Haven, CT, for Plaintiff.

Philip J. O'Connor, Gordon, Muir & Foley, Hartford, CT, Paul A. Leodori, Brian Fox, Siegal & Napierkowski, Cherry Hill, NJ, John W. Lemega, Halloran & Sage, Hartford, CT, William Gerald McElroy, Jr., Erin Morrae Magley, Jonathan H. Koenig, Zelle, Hofman, Voelbel, Mason & Gette LLP, Waltham, MA, Sherri N. Robinson, Lustig & Brown, New York City, James J. Duggan, Stephanie S. Gelber, Lustig & Brown, Buffalo, NY, Darren P. Renner, Lustig & Brown, Stamford, CT, Brian W. Smith, Richard J. Buturla, Thomas Galvin Cotter, Warren L. Holcomb, Berchem, Moses & Devlin, P.C., Milford, CT, Frank H. Santoro, Danaher, Tedford, Lagnese & Neal, Hartford, CT, Kathleen F. Munroe, Litchfield Cavo, Avon, CT, Patrick J. Dwyer, Mark D. Speed, Mario Castellitto, Polstein, Ferrara, Dwyer & Speed, New York City, for Defendants.

### RULING AND ORDER ON THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

UNDERHILL, District Judge.

Yale University ("Yale") seeks a declaration that it is entitled to insurance coverage under certain third-party liability and first-party property insurance policies issued by the defendants for expenditures Yale incurred to address the presence of lead and asbestos in buildings it owns. Several of the defendant insurers (collectively the "Insurers") have moved for summary judgment raising various policy-based defenses to coverage.[1] Yale has vigorously opposed the Insurers' motions.

---

1. Specifically, defendants Insurance Company of North America, Pacific Employers Insurance Company, and Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America, and as successor to Indemnity Insurance Company of North America, have moved for summary judgment

After hearing oral argument and considering the parties' submissions, the court concludes that the Insurers are entitled to summary judgment on the third-party liability policies because Yale has failed to come forward with any evidence that the expenses for which it seeks coverage were incurred because of third-party property damage as required by the policies. The court further concludes that the Insurers are entitled to partial summary judgment on the first-party property policies. Specifically, the Insurers are entitled to summary judgment on Yale's claims for coverage under the all risk policies for property loss or damage in the form of asbestos contamination because such property loss or damage is excluded from coverage by the all risk policies' "Contaminant or Pollutant" exclusions. The Insurers are also entitled to summary judgment on Yale's claims for coverage under the all risk policies for lead-paint contamination, except to the extent that Yale seeks coverage for costs it incurred to remediate non-voluntary lead-based paint remediation. Finally, the Insurers are entitled to summary judgment on Yale's claims for coverage under the specified peril policies because Yale has failed to come forward with any evidence of the existence of applicable coverage.

### STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, if there is "no genuine issue as to any material fact ... the moving party is entitled to a judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986), *on remand*, 807 F.2d 44 (3d Cir.1986), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317 (2d Cir.1975). In addition, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Eastway Construction Corp. v. New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226. (1987).

"As to materiality, the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* The parties agree that Connecticut substantive law governs the construction and application of the insurance policies at issue in this case.

In *Heyman Assocs. No. 1 v. Insurance Co. of the State of Pa.*, 231 Conn. 756, 653 A.2d 122 (1995), the Connecticut Supreme Court summarized the status of the pertinent Connecticut insurance law as follows:

Under [Connecticut] law, the terms of an insurance policy are to be construed according to the general rules of contract construction. The determinative question is the intent of the parties, that is, what coverage the ... plaintiff expected to receive and what the defen-

---

on the third-party liability policies. Defendants Highlands Insurance Company ("Highlands") and National Union Fire Insurance Company Pittsburgh, PA ("National Union") joined in that motion. Defendants Century

Indemnity Company and Indemnity Insurance Company of North America have moved for summary judgment on the first-party property policies. Highlands joined in that motion.

dant was to provide, as disclosed by the provisions of the policy. If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. However, when the words of an insurance contract are, without violence, susceptible of two equally responsible interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted. This rule of construction favorable to the insured extends to exclusion clauses.

Our jurisprudence makes clear, however, that although ambiguities are to be construed against the insurer, when the language is plain, no such construction is to be applied. Indeed, courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties.

*Id.* at 770–71, 653 A.2d 122 (citations and internal quotations and brackets omitted). "Interpretation of an insurance policy like the interpretation of other written contracts involves a determination of the intent of the parties as expressed by the language of the policy. . . . Unlike certain other contracts, however, where absent statutory warranty or definitive contract language the intent of the parties and thus the meaning of the contract is a factual question subject to limited appellate review . . . construction of a contract of insurance presents a question of law. . . ." *Aetna Life & Casualty Co. v. Bulaong,* 218 Conn. 51, 58, 588 A.2d 138 (1991).

## DISCUSSION

### I. THE THIRD–PARTY LIABILITY POLICIES[2]

The Insurers issued several third-party liability policies to Yale. Those policies provide, in pertinent part, that the Insurers will pay "on behalf of the insured all sums which the insured shall become legally obliged to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence."[3] Property damage is defined by the policies as "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." The insurance does not apply, however, to

**2.** Insurance Company of North America and Century Indemnity Company issued several liability policies to Yale, including general liability policies and owners and contractors liability policies. (Policy Nos. LAB 1270 (7/1/59–7/1/62); LAB 1295 (7/1/62–7/1/63); LAB 21622 (7/1/67–7/31/72); LAB 16333 (7/1/63–7/1/64); LAB 16349 (7/1/64–7/1/67); ISL GO 9615064 (7/1/87–7/1/88); HDO G1 174272–5 (7/1/88–7/1/89); ISL GO 9615064 (7/1/87–7/1/88); HDO GO 961888–0 (7/1/90–7/1/91); HDO GO 962025–4 (7/1/91–7/1/92); OCP 401849–9 (10/1/91–10/1/92); HDO GO 962153–2 (7/1/92–7/1/93); HDO GO 962243–3 (7/1/93–7/1/94); HDO GO 962348–6 (7/1/94–7/1/95); HDO G1 422930–9 (7/1/95–7/1/96); HDO G1 8962056 (7/1/96–7/1/97); OCP G1 9321952 (5/1/97–5/1/98); HDO G1 932204A (7/1/97–7/1/98); OCP G1 9321952 (5/1/98–5/1/99); and HDO G1 9316506 (7/1/98–7/1/99)). National Union issued four umbrella liability policies, covering the periods from July 1, 1980 to July 1, 1984 (Policy Nos. BE 133 20 81, BE 133 21 61, BE 133 22 77, and BE 133 22 87), and one excess liability policy that followed form to the umbrella commercial liability policy for July 1, 1980 to July 1, 1981 (Policy No. 1224914). Highlands issued four excess general liability policies covering the periods 1976–77 and 1984–86 (Policy Nos. SR 20125, SR 21801, SR 22262, and SR 22679).

**3.** The Insurers did not move for summary judgment on the policies "bodily injury" coverage.

"property damage to: (1) property owned or occupied by or rented to the insured; (2) property used by the insured; or (3) property in the care custody or control of the insured or as to which the insured is for any purpose exercising physical control...." (The "Owned–Property Exclusion"). In short, the policies provide coverage for sums that Yale becomes legally obligated to pay because of damage to third-party property.[4]

■ The Insurers argue that, applying the unambiguous language of the policies to the undisputed facts of this case, Yale can not recover under the liability policies because Yale has not come forward with evidence of legal damages it has incurred because of third-party property damage. Specifically, the Insurers argue that Yale removed and cleaned up the asbestos and lead in its buildings in anticipation of *potential* future harm, not because of any *actual* third-party property damage. The Insurers argue that the sums expended by Yale are business costs and prophylactic measures, and are therefore simply not "damages" incurred by Yale because of actual third-party property damage. Finally, the Insurers argue that many of the costs for which Yale seeks coverage were incurred by Yale as part of campus-wide renovation and restoration projects, not in response to the governmental directives aimed at Yale.

In response, Yale argues that it is not seeking costs related to renovation projects, but rather costs expended to remove lead and asbestos at the direction of federal, state and local governments. Yale argues that it reasonably interpreted these governmental directives, which were addressed to specific pieces of property owned by Yale, to require Yale to undergo campus-wide removal efforts. At best, Yale argues, the reasonableness of its interpretation of the third-party directives it received presents a disputed issue of material fact precluding summary judgment.

Yale's argument, however, misses the point. The mere existence of third-party directives is not enough to demonstrate a material issue of fact concerning coverage under the policies' "property damage" provisions. To be sure, Yale's litany of third-party directives is directly relevant to the important issue of whether the clean-up costs constitute sums that Yale was "legally obligated to pay" "as damages." *See, e.g., Avondale Indus. Inc. v. Travelers,* 887 F.2d 1200 (2d Cir.1989) (applying N.Y. law); *Gerrish Corp. v. Universal Underwriters Ins.,* 947 F.2d 1023 (2d Cir.1991) (applying VT law); *REO Inc. v. Travelers,* No. 950372522S, 1998 WL 285836 (Conn.Super. May 20, 1998); *Linemaster Switch Corp. v. Aetna Life & Cas. Corp.,* No. CV91–0396432S 1995 WL 462270 (Conn.Super. July 25, 1995). This court need not, however, decide those issues because, even assuming *arguendo* that the clean-up costs incurred by Yale were sums it was "legally obligated to pay" "as damages" pursuant to the directives, the plain language of the policies additionally require that such damages have been incurred *because of third-party property damage. See, e.g., Bausch & Lomb Inc. v. Utica Mutual Ins. Co.,* 330 Md. 758, 625 A.2d 1021, 1036 (1993) ("[I]n the absence of third party property damage, [the insurer] was not obliged to pay [the insured's] abatement expenses incurred at the State's behest."); *Weyerhaeuser Co. v. Aetna Cas. & Surety Co.,* 123 Wash.2d 891, 874 P.2d 142, 150 (1994) ("There may be insurance coverage under a CGL policy because of

---

**4.** Although certain of the policies contain slightly different wording in their coverage provisions and owned-property exclusions, it is undisputed that all of the policies require, as a prerequisite to coverage, third-party property damage.

costs incurred in the regulatory setting *but only if there is property damage*.") (emphasis added). The policies require proof of actual harm to third-party property in order to "eliminate[ ] any risk that insurance companies will be called upon to pay the ordinary costs of compliance with agency regulations." *Metex Corp. v. Federal Ins. Co.*, 290 N.J.Super. 95, 675 A.2d 220, 228 (1996); *see also Weyerhaeuser*, 874 P.2d at 150.

Yale describes the nature of its claims as follows: "In order to meet governmentally imposed legal obligations, mitigate harm to third parties, and remediate damages and losses to its property, the University has been forced to expend large sums of money on asbestos control [and lead abatement], and it anticipates even higher costs in the future." (*See* Pl.'s Interrog.Resps. IA & IIA, attached as Ex. 2 to the Affidavit of Brian Fox in support of the defendants' motions for summary judgment (the "Fox Aff.")). Under the plain language of the policies' Owned–Property Exclusions, however, there can be no coverage for Yale's costs incurred to "remediate damages and losses to [Yale's] property." Yale correctly notes that some courts have recognized an exception to the Owned–Property Exclusion where there is actual or imminent harm to third-party property, including the state's interest in air, soil and water. Those cases are, however, easily distinguished.

First, in many of the cases most favorable to Yale's position, there existed actual or threatened harm to third-party property such that clean up of the insured's own property was necessary to prevent imminent or continued harm to third-party property. *See, e.g., Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699 (7th Cir. 1994) (work on insured's property was not barred because contamination of groundwater constituted a nuisance); *Bankers*

*Trust Co. v. Hartford Acc. and Indem. Co.*, 518 F.Supp. 371 (S.D.N.Y.1981) (work on insured's property not barred because it was undertaken to prevent further leakage of oil into river). As discussed below, Yale has presented no evidence of actual or imminent third-party property damage.

Second, the cases relied upon by Yale ignore the plain language of the policies by allowing the policies' property damage definition to "trump[ ] the Owned Property Damage Definition when the government imposes remedial measures upon the insured, who undertakes the remediation involuntarily." *E.I. du Pont de Nemours & Co., v. Allstate Ins. Co.*, 686 A.2d 152, 157 (Del.1996) (criticizing *Patz* ). This approach is fundamentally inconsistent with established Connecticut law. As the Connecticut Supreme Court recently reaffirmed in *Heyman Assocs.*, it has long been the law that Connecticut "courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." 231 Conn. at 771, 653 A.2d 122 (citations omitted).

Nor can there be coverage for Yale's costs incurred "to meet governmentally imposed legal obligations, [and to] mitigate harm to third parties" unless the costs were incurred because of third-party property damage. Yale has offered no evidence to demonstrate the existence of third-party property damage. Rather, Yale asserts, without factual support, that the policies' Owned–Property Exclusion does not apply because:

> Lead [and asbestos] involve[ ] the factors of lead [and asbestos] getting into the air, ground, water, and potentially water supply and groundwater. The orders and third party claims specifically address lead [and asbestos] in the air, ground, water, and potential water supply and groundwater. The orders and

third party claims specifically address lead [and asbestos] in the air, ground, groundwater, and potential water supply, interior and exterior lead [and asbestos], as well as lead [and asbestos] causing bodily injury by inhalation or ingestion.

(Yale's Local Rule 9(c)(2) Statement at ¶¶ 18 & 26) (hereinafter "(9)(c)(2) Stmt."). Even if Yale's cryptic assertion that lead and asbestos "involve the factors" of "getting into the air, ground, water, and potentially water supply and groundwater," accurately describes the properties of lead and asbestos, that description is obviously insufficient to demonstrate that the lead and asbestos contamination at Yale actually caused third-party property damage.

More importantly, however, to the extent Yale argues that the lead and asbestos `in its buildings in fact caused third-party property damage, Yale has simply failed to present evidence of any such damage. Specifically, with respect to lead-based paint, Yale improperly asserts that the several directives issued by City of New Haven "addressed chipped and flaking lead that had gotten into the air, onto the ground, and/or potentially into the water supply." (Yale's 9(c)(2) Stmt. at ¶¶ 1–6.) The directives themselves, however, nowhere reference any migration of lead to air (let alone to the ambient air outside the building itself), ground (let alone ground owned by third parties), or to any water supply (let alone to groundwater, the public water supply, or any other third party water system). (*Id.* Exs. 1–6 & 33). The directives make no mention of any harm to third-party property nor do they require Yale to take any remedial action to protect or affect property other than its own. (*Id.*) In fact, Yale's own summary of the amounts it incurred to remediate lead hazards demonstrates that the costs it incurred were solely to remediate harm to its own property. (*See id.* at Ex. 6 (calcu-

lating costs for remediation as the minimum costs to "[r]eplace windows," "[r]eplace trim," "[s]trip and repaint trim," "[s]trip and repaint doors," "[a]ddress cabinets and shelving," "[m]iscellaneous painting," multiplied by the number of units at each building at which work was done)); (*see also* Depo. of Thomas Oimuet, attached as Ex. 4 to Fox Aff. at 111–13 (describing costs associated with responding to lead directives as "waste costs, analysis of waste to determine lead content and leachability, worker training, worker blood testing, exposure monitoring, [and] purchase of personal protective equipment")).

None of the asbestos-related directives or complaints submitted by Yale in opposition to the Insurers' motions indicate the existence of third-party property damage. For example, in its opposition, Yale cites to an August 28, 1997 order from the State of Connecticut Department of Environmental Protection relating to asbestos at the former Yale Co-op bookstore. That order faulted Yale for "allowing the disturbance/removal of asbestos-containing materials," namely "floor tile, flooring mastic and pipe insulation," within the site while Yale was performing renovations there. (*See* Yale's 9(c)(2) Stmt., Ex. 17.) Yale, again cryptically, asserts that that order "addressed asbestos and asbestos-containing materials in the air." The closest, however, the August 28, 1997 directive comes to discussing the discharge of asbestos into the air is its charge that Yale violated 40 C.F.R. § 61.145(c) (requiring "owner or operator of a demolition or renovation activity . . . to comply with procedures for emission control . . .") and 40 C.F.R. § 61.150(a) (prohibiting the "discharge [of] visible emissions to the outside air during the collection, processing, (including incineration), packaging, or transporting of any asbestos-containing waste

material generated by the source, or use one of one of the emission control and waste treatment methods specified in paragraph (a)(1) through (4) of this section."). (Yale's 9(c)(2) Stmt., Ex. 18). The mere fact, however, that the Connecticut DEP alleged that Yale did not follow mandated methods for controlling asbestos emissions is not a sufficient basis, standing alone, upon which a reasonable trier of fact could infer that there was either actual or imminent harm to third-party property from Yale's activities at the Co-op. Similarly, although Yale avers that it received a "complaint" from the City of New Haven Department of Health regarding friable asbestos at Ivy Manor, none of the documents evidencing this "complaint" demonstrate that such asbestos caused damage to third-party property.

■■ Finally, Yale mistakenly argues that the fact that the policies do not include lead or asbestos exclusions, even though such exclusions were available at the time the policies were issued, gives rise to a triable issue of fact as to whether its lead and asbestos related costs are covered. The mere absence of specific exclusions, standing alone, does not create coverage where it otherwise does not exist under the express terms of the policy. *See Commercial Union Ins. Co. v. Flagship Marine Services, Inc.*, 190 F.3d 26, 33 (2d Cir.1999) (after finding that marine insurance policy's "Tow Endorsement" was unambiguous, the Second Circuit overruled the District Court's holding that the "endorsement's silence as to non-yachts creates coverage") (citing *Advance Watch Co. v. Kemper Nat'l Ins. Co.*, 99 F.3d 795, 805 (6th Cir.1996) ("[T]he absence of an exclu-

sion cannot create coverage; the words used in the policy must themselves express an intention to provide coverage for liability for the kind of occurrence or injury alleged by the claimant."); and *Continental Cas. Co. v. Pittsburgh Corning Corp.*, 917 F.2d 297, 300 (7th Cir.1990) ("[A]n exclusion from insurance coverage cannot create coverage.")). This is so because, under Connecticut law, "[t]he determinative [coverage] question is the intent of the parties, that is, what coverage the plaintiff expected to receive and what the defendant was to provide, *as disclosed by the provisions of the policy.*" *Heyman Assocs.*, 231 Conn. at 770, 653 A.2d 122 (emphasis added) (quoting *Griswold v. Union Labor Life Ins. Co.*, 186 Conn. 507, 512–13, 442 A.2d 920 (1982)); *see also R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co.*, 287 F.3d 242 (2d Cir.2002) (Under Connecticut law, "[t]he interpretation of an insurance policy . . . involves a determination of the intent of the parties *as expressed by the language of the policy* . . . including what coverage the . . . insured expected to receive and what the insurer was to provide, *as disclosed by the provisions of the policy . . . .* A contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived *from the four corners of the policy . . . .*") (emphasis added).

In sum, Yale has raised no triable issue of fact concerning whether the costs it incurred to comply with the lead and asbestos directives it has identified related to third-party property damage. The Insurers are, therefore, entitled to summary judgment on the CGL policies' "property damage" coverage.[5]

---

**5.** Yale conceded at oral argument that it is not seeking coverage under the Insurers' policies that contain a lead exclusion, under the "owners and contractors protective liability policies" issued by the Insurers, or under the "accident" based policies. (Trans. Oral

Arg., [Doc. # 233] at 6–10 & 13.) Despite Yale's assertion at oral argument that it was seeking coverage under the policies containing an asbestos exclusion (*see id.* at 12), Yale conceded in its papers that it is not seeking coverage under those policies. (Defs' Local

## II. THE "ALL RISK" FIRST–PARTY PROPERTY POLICIES[6]

Yale also seeks coverage under certain "all risk" first-party property policies issued by defendant Indemnity Insurance Company of North America ("IINA"). The all risk policies "insure[ ] against all risk of physical loss of or damage to property described [in the policies] ... except as [otherwise] excluded [in the policies]." The all risk policies then list several risks for which coverage is not provided, including "faulty workmanship or design," "wear and tear," and "contamination."

IINA raises several defenses to coverage under the all risk policies. First, it argues that Yale's claimed losses do not constitute "physical loss of or damage to property" as required to trigger coverage under the policies. IINA further argues that the losses for which Yale seeks coverage were not the result of a fortuitous event or an external cause. Finally, IINA argues that the policies' "Faulty Materials, Workmanship or Design," "Ordinary Wear and Tear," and "Contamination" exclusions bar coverage.

■ "The language of all-risk policies is not to be given a restrictive meaning." *Costabile v. Metropolitan Property and Cas. Ins. Co.,* 193 F.Supp.2d 465, 477 (D.Conn.2002). "All-risk policies, however, are not 'all loss' policies—rather, all-risk

policies, including the policy at issue here, often contain express written exclusions and implied exceptions that have been developed by the courts over the years." *Id.* Thus, "a policy of insurance insuring against 'all-risks' is to be considered as creating a special type of insurance extending to risks not usually contemplated, and recovery will usually be allowed, at least for all losses of a fortuitous nature, in the absence of fraud or other intentional misconduct of the insured, unless the policy contains a specific provision expressly excluding the loss from coverage." *Id.*

■ As a general matter, "[t]he existence of coverage is an essential element of the insured's case and the insured has the burden of proving the loss falls within the terms of the policy." *Giovanna's Restaurant v. Twin City Fire Insurance,* 1998 WL 950977, *2 (Conn.Super. Dec.28, 1998), citing Brown v. Employer' Reinsurance Corp.,* 206 Conn. 668, 539 A.2d 138 (1988). More specifically, "the all risk insured has generally met his burden of proof by establishing ... a fortuitous loss within the comprehensive coverage though not proving exactly what caused it." *Standard Structural Steel,* 597 F.Supp. at 192; *see also Atlantic Lines Ltd. v. American Motorists Ins. Co.,* 547 F.2d 11, 12 (2d Cir. 1976) ("[F]or recovery under an all risks policy, an insured need demonstrate only that a fortuitous loss has occurred."). "As

Rule 9(c)(1) Stmt. at 19.) Accordingly, the Insurers are entitled to summary judgment on the policies containing a lead exclusion (Policy Nos. HDO G1 422930–9 (7/1/95–7/1/96) and HDO G1 931650–6 (7/1/98–7/1/99)) and/or an asbestos exclusion (Policy Nos. ISL GO 961506–4 (7/1/87–88), HDO G1 174272–5 (7/1/88–7/1/89), HDO GO 961766–8 (7/1/88–7/1/90), HDO GO 961888–0 (7/1/90–7/1/91), HDO GO 962025–4 (7/1/91–7/1/92), HDO GO 962153–2 (7/1/92–7/1/93), HDO GO 962243–3 (7/1/93–7/1/94), HDO GO 962348–6 (7/1/94–7/1/95), XCP G1 715472–2 (7/1/94–7/1/95), HDO G1 1422930–9 (7/1/95–7/1/96), HDO G1 896205–6 (7/1/96–7/1/97), HDO G1 932204–A

(7/1/97–7/1/98), and HDO G1 931650–6 (7/1/98–7/1/99)), the accident based policies (Policy Nos. LAB 1270 (7/1/59–7/1/62) and LAB 1295 (7/1/62–7/1/63)), and the "owners and contractors protective liability policies" (Policy Nos. OCP G1 401849–9 (10/1/91–10/1/92), OCP G1 9321952 (5/1/97–5/1/98), and OCP G1 9321952 (5/1/98–5/1/99)).

6. Defendant Indemnity Insurance Company of North America issued two all risk policies (Policy Nos. Maud 3406886–0 (7/1/96–7/1/98), and CX D3 4075128 (7/1/98–7/1/2001)).

with any insurance, property insurance coverage is 'triggered' by some threshold concept of injury to the insured property.... In modern policies, especially of the all-risk type, this trigger is frequently physical loss or damage...." 10 *Couch on Ins.* § 148:46 (3d ed.2002). Thus, Yale bears the initial burden of demonstrating that it has suffered a fortuitous "physical loss of or damage to" covered property.[7] If Yale sustains this burden, the burden then shifts to IINA to demonstrate that Yale's claimed losses are otherwise excluded from coverage.

### A. *"Physical Loss of or Damage to Property"*

IINA first argues that Yale has failed to come forward with sufficient evidence from which a reasonable trier of fact could conclude that Yale's losses constitute "physical loss of or damage to property." Specifically, IINA argues that Yale improperly seeks coverage for losses it incurred because of "the mere presence of asbestos and lead in Yale's buildings." As such, IINA concludes, Yale improperly seeks coverage for economic losses, rather than costs incurred due to "physical loss of or damage to" Yale's property.

There is little doubt that Yale could not properly seek coverage under the all risk policies for costs incurred due to the mere presence of asbestos-and lead-containing materials in its buildings. *See Great Northern Ins. Co. v. Benjamin Franklin Federal Savings & Loan Assoc.,* 793 F.Supp. 259 (D.Or.1990); *Pirie v. Federal Ins. Co.,* 45 Mass.App.Ct. 907, 696 N.E.2d 553 (1998); *Leafland Group–II v. Ins. Co. of North Amer.,* 118 N.M. 281, 881 P.2d 26 (1994) (dimunition in value of property due to presence of asbestos was not fortuitous

"direct loss"); *see also J.Z.G. Resources, Inc. v. King,* 987 F.2d 98, 101 (2d Cir.1993) (questioning whether, under CGL policy "improper grades, elevations and location" constituted "physical injury"); *cf. U.S. Surgical Corp. v. U.S. Fire Ins. Co.,* 1990 WL 277471, *2 (Conn.Super. Oct. 5, 1990) ("[T]he phrase 'against all risks of physical loss or damage from any external cause' encompasses coverage under the said policy for loss of value of an insured item *caused by an event insured against."*) (emphasis added). IINA, however, mistakenly asserts that Yale in fact seeks coverage on that basis.

Specifically, IINA improperly relies on Yale's responses to certain of the Insurers' interrogatories to assert that Yale seeks coverage for the "mere presence of asbestos" in its buildings. Although Yale's interrogatory responses do state that Yale contends its buildings were "damaged by the presence of" asbestos and lead, the responses go on to cite *Sentinel Management Co. v. New Hampshire Ins. Co.,* 563 N.W.2d 296 (Minn.Ct.App.1997), for the proposition that "contamination" caused by asbestos fibers and lead constitute direct physical loss to property under an all risk policy. (Yale's Interrog.Resps. (I)(C)(2) & (II)(C)(2), attached as Ex. 2 to Fox Aff.). Moreover, both in its opposition papers (*see, e.g.,* Yale's Opp.Memo. at 6), and at oral argument (*see, e.g.,* Trans. Oral Arg. at 59 ("It's not clear we really have any buildings that have no migration.")), Yale clarified that the "physical loss of or damage to property" for which it seeks coverage is the contamination of its buildings by the presence of friable asbestos and non-intact lead-based paint, not the mere presence of intact materials containing lead or asbestos. In short, Yale seeks coverage

---

7. In the procedural context of a summary judgment motion, Yale's burden is to come forward with sufficient evidence to permit a

reasonable trier of fact to find that Yale suffered a fortuitous loss of or damage to covered property.

for the presence of asbestos and lead contamination in its buildings, not for the mere presence of materials containing asbestos and lead.[8]

In apparent recognition of the proper scope of Yale's claims, IINA also argues, in its reply brief, that the presence of lead and asbestos contamination in Yale's buildings also can not constitute "physical loss of or damage to property." IINA's argument is, however, misplaced. Specifically, IINA places undue reliance on *Great Northern Ins. Co. v. Benjamin Franklin Federal Savings & Loan Assoc.*, 793 F.Supp. 259 (D.Or.1990), and *Pirie*, 45 Mass.App.Ct. 907, 696 N.E.2d 553. *Great Northern* is factually inapposite because, in that case, the insured sought coverage to remove intact asbestos-containing materials. As discussed above, Yale does not and could not seek coverage for the mere presence of intact asbestos-and lead-containing materials in its buildings.[9] Similarly, in *Pirie*, "[t]here was no peeling or chipping paint, paint dust, or ongoing work ... during the policy period ...." 696 N.E.2d at 554.

IINA also fails even to consider, let alone distinguish, the substantial body of case law in which a variety of contaminating conditions have been held to constitute "physical loss of or damage to property." *See, e.g., Matzner v. Seaco Ins. Co.*, 1998 WL 566658 (Mass.Super. Aug. 12, 1998.) ("direct physical loss" was ambiguous, thus carbon monoxide contamination would come under definition); *Columbiaknit, Inc. v. Affiliated FM Ins. Co.*, 1999 WL 619100 (D.Or. Aug.4, 1999) (mildew contamination was direct physical loss) *Farmers Ins. Co. of Oregon v. Trutanich*, 123 Or.App. 6, 858 P.2d 1332 (1993) (losses caused by odors from illegal methamphetamine cooking were direct physical loss) *Murray v. State Farm Fire & Cas. Co.*, 203 W.Va. 477, 509 S.E.2d 1, 16–17 (1998) ("Losses covered by the [all risk] policy, including those rendering the insured property unusable or uninhabitable, may exist in the absence of structural damage to the property."); *see also BellSouth Telecommunications, Inc. v. W.R. Grace & Co.*, 77 F.3d 603 (2d Cir.1996) (the event triggering coverage in the asbestos context is the contamination, not the mere presence of asbestos in the building's products). Thus, Yale has sustained its burden of demonstrating that it has suffered "physical loss of or damage to property" as

---

8. Yale's somewhat imprecise reference to the "presence of lead and asbestos," rather than the more precise "lead and asbestos contamination," may simply be a semantical attempt to avoid running afoul of the policies' unambiguous language excluding coverage for "loss or damage caused by, resulting from, contributed to, made worse by actual or alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS ...."

9. For the same reason, IINA's "external cause" argument fails. Specifically, IINA argues that "Yale can not point [to] any external cause which caused its loss," because "Yale's position is that its loss arises out of the mere presence of lead and asbestos in its buildings." Yale, however, does not truly seek coverage for the mere presence of intact asbestos- and lead-containing materials. Rather, it seeks coverage for the presence of lead and asbestos contamination. Although any asbestos or lead contamination to Yale's buildings would, of course, in part be caused by the inherent toxic nature of those substances, it would also have been caused by some external force that either dislodged intact asbestos fibers or made lead ingestible or inhaleable. As such, Yale's claimed property damage (i.e., contamination) is due, at least in part, to external causes. *See Standard Structural*, 597 F.Supp. at 193 (A loss will have been because of an external cause if the "damage which arises from it does not result *wholly* from an inherent defect in the subject matter or from the inherent deficient qualities, nature, or properties or the subject matter.") (emphasis added).

required under the all risk policies for the presence of asbestos or lead contamination in its buildings.

### B. *Fortuity*

 IINA next argues that Yale has failed to demonstrate that its claimed losses were fortuitous. It is axiomatic that in order for a loss to be covered under an all risk policy, it must have been fortuitous. *See, e.g., Ingersoll Mill. Mach. Co. v. M/V Bodena*, 829 F.2d 293 (2d Cir.1987) ("All risk coverage covers all losses which are fortuitous no matter what caused the loss, including the insured's negligence, unless the insured expressly advises otherwise."). "Broadly stated, the fortuity doctrine holds that insurance is not available for losses that the policyholder knows of, planned, intended, or is aware are substantially certain to occur." *National Union Fire Ins. Co. v. Stroh Cos., Inc.*, 265 F.3d 97, 106 (2d Cir.2001).

 Although the Connecticut Supreme Court has yet to define the precise parameters of the fortuity doctrine, other guidance abounds. In the seminal case of *Standard Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F.Supp. 164, 193 (D.Conn.1984), relied upon by both parties, the court held that fortuity must be determined "by standing in the shoes of the parties at the time the contract of insurance was made." *See also United Technologies Corp. v. American Home Assurance Co.*, 989 F.Supp. 128, 148 (D.Conn. 1997). The *Standard Structural* holding is consistent with the holdings of the courts of several other jurisdictions. *See, e.g., University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1281 (6th Cir.1995) (noting adoption of Restatement rule by Ohio Court of Appeals); *Adams–Arapahoe Joint Sch. Dist. No. 28–J v. Continental Insurance Company*, 891 F.2d 772 (10th Cir.1989) (predicting Colorado law); *Compagnie des Bauxites de Guinee v. Insurance Co. of North America*, 724 F.2d 369, 372 (3d Cir.1983) (predicting Pennsylvania law); *Texas E. Transmission Corp. v. Marine Office—Appleton & Cox Corp.*, 579 F.2d 561, 564–66 (10th Cir. 1978); *Underwriters Subscribing to Lloyd's Ins. Cert. No. 80520 v. Magi, Inc.*, 790 F.Supp. 1043, 1047 (E.D.Wash.1991) (predicting Washington law); *Kilroy Indus. v. United Pac. Ins. Co.*, 608 F.Supp. 847, 857–58 (C.D.Cal.1985); *Essex House v. St. Paul Fire & Marine Ins. Co.*, 404 F.Supp. 978, 992–93 (S.D.Ohio 1975); *Fidelity & Guar. Ins. Underwriters, Inc. v. Allied Realty Co.*, 238 Va. 458, 384 S.E.2d 613, 615 (1989).[10] Applying the test set

---

10. Some courts and commentators have recognized a different standard of fortuity, labeled the "objective view," and have contrasted that view with the standard set forth in *Standard Structural*, labeled the "modern subjective" view of fortuity. *See, e.g.,* Stephen A. Cozen and Richard C. Bennett, *Fortuity: The Unnamed Exclusion*, 20 Forum 222 (1985); *Adams–Arapahoe Joint Sch. Dist. No. 28–J*, 891 F.2d 772 (10th Cir.1989). Under the older, "objective view" of fortuity, a loss is fortuitous if it was not inevitable at the time of the contract. *Adams–Arapahoe*, 891 F.2d at 775. In other words, if in hindsight the loss was certain to occur, there can be no coverage. *Id.* One of the cases most often cited as an exemplar of the "older, objective view" is *Greene v. Cheetham*, 293 F.2d 933 (2d Cir.1961). To decide this case it is not necessary to predict which view of fortuity the Connecticut Supreme Court would adopt. First and foremost, both parties rely upon *Standard Structural* in their briefs. Neither party urges the "older, objective view." Furthermore, *Greene* is clearly distinguishable from the present case. In *Greene*, it was clear not only that the loss was inevitable, but that the insured knew of the inevitable defect. Thus, because there was a confluence of the inevitability in fact of the loss, and the insured's knowledge of the inevitability, the court did not need to address the issue whether inevitability should be viewed with the benefit of hindsight. In addition, the loss was certain to occur during the policy period.

forth in *Standard Structural,* the court concludes that, although the fortuity doctrine bars many of the losses for which Yale seeks coverage, it does not, as a matter of law, preclude coverage for all of Yale's claimed losses.

IINA argues that the fact that asbestos- and lead-containing "material intentionally was used in the planned design and construction of the buildings from which it is being removed or encapsulated," renders Yale's losses non-fortuitous. (IINA's Memo at 10.) IINA's argument is, again, based on the faulty premise that the source of Yale's claimed property damage is the "mere presence of lead and asbestos in its buildings." (*Id.* at 10–11.) As discussed above, Yale, in fact seeks coverage for asbestos and lead contamination, not the mere presence of materials containing lead and asbestos. Thus, the fact that the parties may have been aware, at the time of the issuance of the policies, of the presence of asbestos- and lead-containing materials in Yale's buildings is of no import.

Rather, the fortuity doctrine would bar coverage only if the parties were aware, at the time of the issuance of the policies, that asbestos or lead contamination was substantially likely to occur during the policy period. As the court explained in *Sentinel Management Co. v. New Hampshire Ins. Co.,* 563 N.W.2d 296, 300 (1997), although when "[v]iewed in hindsight, the eventual contamination of [an insured's]

buildings [may be] inevitable, due to the presence of asbestos-containing materials . . . so far as all parties were concerned, asbestos contamination was a risk inherent in owning twenty-year-old apartment buildings, but it was not a certainty." Here, at the time IINA issued the policies, it was entirely plausible and possible that Yale's buildings would not become contaminated despite the presence of materials containing lead and asbestos in those buildings. As such, the parties could not have "know[n] of, planned, intended, or [been] aware," that the contamination was "substantially certain to occur" at the time of the issuance of the policies. *National Union,* 265 F.3d at 106.

■ IINA next argues that the fortuity doctrine bars Yale's claims to the extent "Yale has made a decision to remove or encapsulate lead and asbestos in its buildings." (IINA's Memo at 11.) The doctrine of fortuity would bar Yale from recovering costs incurred for the voluntary removal of non-contaminating lead and asbestos. *See University of Cincinnati v. Arkwright Mutual Insurance Co.,* 51 F.3d 1277 (6th Cir.1995) (where the insured decided to demolish a building it owned, but was required by state law to remove intact asbestos from the building before engaging in demolition, the loss was not fortuitous). Thus, for example, if Yale undertook renovation or remodeling projects and, as a result, was required by law to

---

The court therefore did not need to reach the issue whether the policy covered a loss that was eventually inevitable, but would occur at some uncertain time in the future. *See, e.g., St. Paul Fire & Marine Ins. Co. v. General Injectables & Vaccines, Inc.,* 2000 WL 270954 (W.D.Va., Mar. 3, 2000) (damage to vaccines was not "a loss that was certain to occur' at the time the parties entered the insurance contract," but rather a "risk" because "although [the insured] may have had reason to believe that the unit might fail sometime in the future, it did not know that it would fail

during the policy period, or that the failure inevitably would damage the vaccines.") Finally, a strong argument could be made that *Standard Structural* and *Greene* do not represent opposing "objective" and "subjective" views, but rather that *Standard Structural* harmonizes *Greene* by citing to that case for the general proposition that inevitable damage is not fortuitous, and then setting forth the viewpoint from which such inevitability must be determined. *See Standard Structural,* 597 F.Supp. at 191, 193.

engage in remediation to remove or abate non-contaminating lead and asbestos in connection with such projects, coverage for its claimed losses would be barred by the doctrine of fortuity.[11]

Yale's claims do not, however, appear to be limited to voluntary actions or decisions. For example, Yale has presented evidence that it employs an asbestos removal crew on site. The crew has undertaken emergency asbestos removal and abatement in the following types of situations: where a student tried to knock down a door and in so doing released asbestos material into a dorm (Thomas Ouimet Depo., Yale's 9(c)(2) Stmt., Ex. 7 at 85); spray-on insulation in a laboratory ceiling became damaged by students running cabling through it (*id.* at 87–88); asbestos insulation fell off pipes in a tunnel system underneath buildings in which maintenance workers needed to work (*id.* at 91); and asbestos-containing materials sustained water damage (*id.* at 89). Similarly, Yale has come forward with evidence of lead contamination. Specifically, Yale has presented evidence that some of its buildings contained chipping, flaking or peeling lead paint, powdered lead and/or lead dust. (Aff. of Thomas Ouimet at ¶ 22.) Thus, Yale has presented sufficient evidence to create a triable issue of fact concerning whether some of its claimed losses were incurred as a result of contaminating lead and asbestos, and not because of pro-active efforts to address possible contamination or to facilitate voluntary remodeling or renovation work.

Finally, IINA argues that Yale's losses were not fortuitous because Yale necessarily knew of the asbestos and lead contamination at the time of the issuance of the policies. Specifically, IINA asserts that there can be no disputed issue of material fact that the losses for which Yale seeks coverage were incurred prior to the issuance of the policies because "Yale . . . had full awareness of the need for lead and asbestos abatement," prior to July 1, 1996, the date the first all risk policy was issued, and because Yale then applied the governmental orders and directives it received prior to that date university-wide.

IINA's argument is misplaced. As a preliminary matter, the court declines to reach this argument because IINA voluntarily withdrew its "known loss" argument in order to facilitate resolution of Yale's motion for discovery under Rule 56(f) of the Federal Rules of Civil Procedure. Although presented as merely a subpart of IINA's "fortuity" argument, the argument is, as a practical matter, indistinguishable from its "known loss" defense. *See generally National Union,* 265 F.3d at 106 ("The 'known loss' defense is a variation on the fortuity theme. It holds that an insured may not obtain insurance to cover a loss that is known before the policy takes effect.") (citation omitted). Moreover, IINA's argument is founded on an improper inference. Specifically, although IINA may successfully demonstrate that Yale was aware, at the time of the issuance of the policies, of the contamination specified in the directives and that Yale is, therefore, precluded as a matter of law from obtaining coverage for such losses, it simply does not follow that because Yale was aware of specific pre-policy instances of contamination, it must therefore have been

---

11. Of course, to the extent that IINA argues more broadly that any remediation costs voluntarily incurred by Yale in response to actual contamination would be barred, they are mistaken. *See, e.g., National Union,* 265 F.3d at 111 (although product recall "was 'intentional' in the sense that it was a purposeful and willful act, and the resulting loss was in that limited sense non-fortuitous . . . the 'Loss' was nevertheless 'fortuitous' in the sense that it resulted from an accidental or unintended event . . .").

aware of any and all contamination on its campus at that time or of the imminence of contamination of any other site.

In sum, Yale has met its burden of demonstrating a triable issue of fact as to whether some of the claimed "physical loss of or damage" to its property, in the form of asbestos or lead contamination, was fortuitous.

## C. *Faulty Workmanship, Materials or Design and Wear and Tear Exclusions*

IINA avers that several exclusions in the all risk policies bar coverage for Yale's claimed losses. The all risk policies provide, in pertinent part, that they do not insure "against the costs of making good defective design or specifications, faulty material, or faulty workmanship ..." (the "Faulty Material" exclusion) or "against ordinary wear and tear, or gradual deterioration ..." (the "Wear and Tear" exclusion). IINA argues that the losses sustained by Yale resulted from these excluded perils and therefore are not covered under the policies. Specifically, with respect to the Faulty Materials exclusion, IINA argues that, because "Yale claims that the presence of lead and asbestos is what has caused damage to its buildings [and] the losses for which Yale seeks coverage are the costs associated with lead and asbestos removal ... the presence of asbestos and lead in its buildings is both the cause preceding physical damage and the subsequent result of the physical damage." (IINA's Memo. at 20.) With respect to the Wear and Tear exclusion, IINA argues that Yale has admitted that natural deterioration caused the materials containing lead and asbestos to degrade slowly over time, thus releasing asbestos fibers and lead chips and dust, and therefore that its losses were caused by

the very peril excluded by the "ordinary wear and tear" exclusion. (*Id.* at 21.)

 As discussed above, Yale does not actually seek coverage for the mere presence of materials containing asbestos and lead in its buildings. If Yale had made such a claim, there is no serious doubt that the insurers would be entitled to summary judgment under the Faulty Material exclusion. *See Leafland Group–II v. Ins. Co. of North Amer.,* 118 N.M. 281, 881 P.2d 26 (1994). Similarly, to the extent Yale seeks coverage for money spent repairing or replacing worn materials containing lead and asbestos, but that did not actually present a contaminating condition, its claims would be barred by the plain language of the Wear and Tear exclusion. Yale does not, however, contest these points.

 Rather, Yale focuses on the fact that the policies provide coverage for "loss or damage *resulting from* ... defective design or specifications," and for "loss or damage ensu[ing]" from "ordinary wear and tear, or gradual deterioration." (Yale's Memo. at 7.) Yale then argues that the amounts it spent to remediate the lead and asbestos contamination in its buildings are losses that resulted from the inherent defect in the materials and/or from ordinary wear and tear, not the actual faulty or deteriorated materials themselves. In other words, Yale argues, the contamination itself is a distinct property loss ensuing from the otherwise excluded losses of the defective nature of asbestos and lead paint and/or the wear and tear to the building materials containing those substances.

The court agrees. In *United Technologies Corp. v. American Home Assurance Co.,* 989 F.Supp. 128 (D.Conn.1997), the insured sought coverage under three all risk policies for groundwater, surface water and soil contamination at several of its locations due to its own manufacturing and

disposal practices. The insurer sought to deny coverage relying, *inter alia*, on an exclusion for "[o]rdinary wear, tear, gradual deterioration, or inherent vice unless other loss or damage from a peril insured against herein ensues and then only for loss, damage or business interruption caused by the ensuing loss or damage." *Id.* at 154. Specifically, the insurer argued that the exclusion barred coverage for certain losses that were caused when corrosion created holes in a sump and when leaks formed in a chemical holding tank, thus releasing chemical contaminants into the surrounding soil. *Id.* The parties agreed that, under the terms of the exclusion, the damage to the insured's waste disposal equipment itself (i.e. the sump and holding tank) was not covered. *Id.* The parties disagreed, however, about whether the resulting contamination was excluded or was an "ensuing loss." The court concluded that "the environmental contamination resulting from the deterioration damage to the [waste disposal equipment] may be deemed a separate, independent and thus covered peril under the Policies." *Id.*

In *Sentinel Management Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296 (Minn.App.1997), a case even more directly on point, the insured sought coverage under an all risk policy for asbestos contamination of residential properties it owned. The trial court denied summary judgment for the insurer, but certified for appeal the question of "[w]hether a loss resulting from the release of asbestos fibers in a residential building caused by abrasions of asbestos-containing materials, air circulation and building vibrations is a covered peril under an all-risk, first-party property insurance policy?" *Id.* at 298. In affirming the trial court, the *Sentinel* court examined, inter alia, whether the insured's claimed property damage was caused by wear and tear and therefore excluded. *Id.* at 301–02. The court then went on to

examine whether, even if excluded as caused by wear and tear, the asbestos contamination was nonetheless covered as an "ensuing loss." *Id.* The *Sentinel* court held that "the [policy's] wear and tear and ensuing loss provisions, read together, exclude from coverage the normal results of wear and tear, but cover distinct, separable, ensuing losses like the asbestos contamination." *Id.*

The court agrees with the analyses set forth in *United Technologies Corp.* and *Sentinel Management Co.* As discussed above, the "physical loss of or damage to property" for which Yale seeks coverage is the contamination of its buildings by lead and asbestos. Although asbestos—and lead-containing building materials may certainly be rendered "faulty" or "defective" because of the presence of lead or asbestos, Yale is not seeking coverage for the costs to repair or replace the building materials with materials that do not contain asbestos or lead. Rather, Yale is seeking coverage for contamination of its buildings that resulted from the release of lead and asbestos in its buildings. Similarly, Yale does not seek coverage for damage caused by gradual wear and tear or deterioration of building materials containing lead and asbestos. Rather, it seeks coverage for the ensuing contamination, which contamination may itself have been caused by the wear and tear or deterioration of those materials. Thus, the plain language of the applicable exclusions would exclude coverage for any damage to the lead- or asbestos-containing building materials themselves caused by either the use of faulty materials or wear and tear, but would not exclude any damage to Yale's buildings caused by the resulting contamination.

The cases relied upon by IINA do not undermine the persuasive reasoning of *United Technologies Corp.* and *Sentinel*

*Management Co.* In *Board of Educ. of Maine Township High Sch. Dist. v. International Ins. Co.*, 292 Ill.App.3d 14, 225 Ill.Dec. 987, 684 N.E.2d 978 (1997), the insured school district argued that asbestos-related property damage it sustained was covered under several all risk policies. Specifically, the insured argued that coverage for the asbestos-related damage was not barred by the policies' "latent defect" exclusion because covered external forces (i.e., damage, disturbance or deterioration to the asbestos-containing materials), and not solely the asbestos materials themselves, caused the damage. *Id.* Thus, the insured argued, coverage was available under the policies' exception to the latent defect exclusion covering "loss from covered peril that follows; and then only for the following loss" *Id.*

The *Board of Educ. of Maine Township* court first held that the insured asbestos-related property damage was barred by the policies' latent defect exclusion. *Id.* at 983. Importantly, the latent defect exclusion contained specific language stating that "loss or damage caused by latent defect ... includes damage or loss caused, aggravated by or added to by asbestos related products...." *Id.* at 980. The court then construed the policies' exception for covered perils that follow from excluded perils, and concluded that the trial court erred in finding the clause ambiguous. *Id.* at 983–84. Specifically, the court held that "[r]easonably interpreted, this clause says that if a nonexcluded loss is caused by perils that either occur after an excluded peril or are causally related to an

excluded peril, the nonexcluded loss will remain covered. Only the nonexcluded portion of the loss will be covered, however." *Id.* at 984. The "following loss" exception thus did not "operate ... to give back coverage for loss or damage caused by, aggravated by, or added to by asbestos-related products," an otherwise excluded peril. *Id.*

The central holding of *Board of Educ. of Maine Township* is thus simply that the all risk policies' "following loss" exceptions provide coverage only for *covered* losses that follow from non-covered losses. In other words, the "following loss" exception should not be read to provide coverage for otherwise excluded losses simply because they may have followed from another excluded peril. The *Board of Educ. of Maine Township* holding therefore is not inconsistent with the reasoning of *United Technologies Corp.* and *Sentinel Management Co.*[12]

IINA's reliance on *J.Z.G. Resources* is also misplaced. First, that case is factually distinct in that the salient issue was whether there had been an "occurrence" sufficient to trigger a commercial general liability policy's additional products-completed operations hazard coverage. More importantly, however, *J.Z.G.* recognizes that, although commercial general liability products-completed operations hazard insurance does not provide coverage for damage to an insured's own product, it does provide coverage for resulting third-party damage. That is analogous to the import of IINA's policies "ensuing loss" provisions. Neither the products-complet-

---

**12.** Although *Board of Educ. of Maine Township* does not support the Insurers' argument that Yale's losses were not "ensuing losses," it is supportive of their argument that Yale's asbestos-related losses are barred by the all risk policies' "Contaminant Exclusion." Specifically, as discussed below, Yale's claimed loss of or damage to property in the form of

asbestos contamination is squarely barred by the Contaminant Exclusion. Under the *Board of Educ. of Maine Township* rationale, the policies' ensuing loss provisions would not operate to "give back" coverage for the excluded asbestos losses. *Board of Educ. of Maine Township*, 225 Ill.Dec. 987, 684 N.E.2d at 984.

ed operations hazard insurance at issue in *J.Z.G.* nor the all risk policies in this case would, as IINA fears, be converted under the court's reading into surety bonds or product warranties. Rather, the all risk policies provide insurance against loss of or damage to property in the form of lead or asbestos contamination.

The case of *Laquila Constr., Inc. v. Travelers Indemnity Co. of Ill.*, 66 F.Supp.2d 543 (S.D.N.Y.1999), also relied upon by IINA, makes the same point. The *Laquila* court held that the builder's risk policy at issue, which excluded the "[c]ost of making good faulty or defective workmanship or material . . . ," did not cover the costs incurred by the insured to replace a defective concrete floor slab. *Id.* at 544. Specifically, the court rejected the insured's argument that the mere incorporation of the defective slab into the building caused the building, as a whole, property damage.[13] *Id.* at 546. In explaining its rationale, the court noted, however, that "had the . . . slab . . . collapsed and damaged machinery, plumbing and electrical fixtures, or even neighboring property, such losses—wholly separate from the defective materials themselves—would qualify as non-excluded ensuing losses. . . ." *Id.*

The final case relied upon by IINA is *Vermont Electric Power Co., Inc. v. Hartford Steam Boiler Inspection & Ins. Co.*, 72 F.Supp.2d 441 (D.Vt.1999). In that case, the court concluded that repair and replacement costs incurred by the insured on account of damage to electrical transformers caused by a design defect were not "ensuing losses." *Id.* In support of its holding, the court first stated that "[t]he loss itself . . . was not the design defect, but the damage to the transformers; the defective design was the cause." *Id.* at

445. The *Vermont Electric* court further explained that, if the damage to the transformers was considered as ensuing from the design defect, "then the exception swallows the exclusion." *Id.* The court, citing *Narob Dev. Corp. v. Insurance Co. of N. Amer.*, 219 A.D.2d 454, 631 N.Y.S.2d 155 (N.Y.App.Div.1995), held that "[w]here a property insurance policy contains an exclusion with an exception for ensuing loss, courts have sought to assure that the exception does not supersede the exclusion by disallowing coverage for ensuing loss directly related to the original excluded risk." *Id.*

IINA has not demonstrated that the Connecticut courts would follow the *Vermont Electric* court and require that an ensuing loss not be "directly related to the original excluded risk." Indeed, in *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 251–52, 532 A.2d 1297 (1987), the Connecticut Supreme Court interpreted an analogous ensuing loss provision as "contemplat[ing] coverage for a 'collapse' that *follows consequentially* from excluded activity." (emphasis added); *see also United Technologies Corp.*, 989 F.Supp. at 154–55 (accepting insured's distinguishing of *Acme Galvanizing Co. v. Fireman's Fund Ins. Co.*, 221 Cal.App.3d 170, 270 Cal.Rptr. 405 (1990), and *Aetna Cas. & Sur. Co. v. Yates*, 344 F.2d 939 (5th Cir.1965), both of which were relied upon by the court in *Narob Dev. Corp.*, the sole case cited by the *Vermont Electric* court); *but see Sansone v. Nationwide Mut. Fire Ins. Co.*, 47 Conn.Supp. 35, 770 A.2d 500 (1999) (distinguishing *Beach* on the grounds that, unlike the policy in *Beach*, the policy at issue did not specifically mention "collapse" as a covered ensuing loss), *aff'd*, 62 Conn.App. 526, 771 A.2d 243 (2001). The court de-

---

**13.** *Laquila* thus also further supports the conclusion that the mere presence of asbestos and lead-containing products in Yale's build-

ings is not a covered "loss of or damage to property."

clines IINA's invitation to import *Vermont Electric's* "directly related to the original excluded risk" language into the plain language of the policies at issue in this case.

Finally, IINA incorrectly argues that Yale seeks coverage for the excluded loss itself, and not a "resulting" or "ensuing" loss. Rather, as discussed above, Yale seeks coverage for "physical loss of or damage to" its buildings in the form of contamination. Thus, for example, while gradual wear and tear may have caused flaking or chipping of lead based paint, and such damage to the paint would be excluded, the resulting contamination of the buildings constitutes separate "physical loss of or damage to" the buildings. Similarly, although piping insulation containing asbestos is inherently defective or faulty because it contains asbestos, Yale does not seek coverage to replace the insulation with non-defective material. Rather, Yale seeks coverage for the separate contamination damage caused to its buildings that results from deterioration of the asbestos-containing insulation.[14]

IINA has failed to demonstrate the absence of a genuine issue of material fact concerning whether Yale's losses would be barred from coverage by operation of the policies' Faulty Material and Wear and Tear exclusions and did not constitute covered "ensuing" or "resulting" losses.

### D. *The Contaminant Exclusion*

IINA's final argument is that coverage for the costs incurred by Yale because of asbestos contamination are barred by the following policy language excluding:

> loss or damage caused by, resulting from, contributed to, made worse by actual or alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS . . .

(the "Contaminant Exclusion").[15]

In *Heyman Assocs. No. 1 v. Insurance Co. of the State of Pa.*, 231 Conn. 756, 653 A.2d 122 (1995), the Connecticut Supreme Court interpreted similarly worded pollution exclusions in two third-party liability insurance policies, and held that the plain language of the policies' pollution exclusions excluded coverage for a fuel oil spill.[16] In so holding, the court noted that a liquid, such as oil, was a "pollutant" under the terms of the policy, "if it may be characterized as an 'irritant' or 'contaminant.'" *Id.* at 772, 653 A.2d 122. The court then relied on Webster's Third Dictionary's definitions of the terms "contaminate" ("to soil, stain, corrupt, or infect by contact or association" or "to render unfit

---

**14.** Although not explicitly raised by Yale, the court notes an additional reason why IINA is not entitled to summary judgment on the Wear and Tear Exclusion. Specifically, Yale has come forward with evidence that at least some of its losses were patently not the result of "ordinary wear and tear, or gradual deterioration." *See, e.g.,* Depo. of Thomas Oumiet, Yale's 9(c)(2), Ex. 7 at 85, 87–88.

**15.** IINA does not argue that Yale's claims for loss caused by lead contamination are barred by this exclusion.

**16.** There were two policies at issue in *Heyman Assocs.*, 231 Conn. at 760 n. 5, 653 A.2d 122. The pollution exclusion in the first policy excluded, in pertinent part, coverage for

" 'bodily injury' or 'property damage' arising out of the alleged or threatened discharge, dispersal, release or escape of pollutants." *Id.* The term "pollutants" was defined by that policy as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material." *Id.* The other policy excluded "any loss, damage or expense caused by contamination or pollution, whether or not brought about by a peril otherwise incurred," and defined "[c]ontamination or pollution . . . as, loss, damages, or expense caused by gas(es), liquid(s), solid(s), or radioactive material which may be harmful to human health or the environment." *Id.*

for use by the introduction of unwholesome or undesirable elements") and "pollute" ("to . . . impair the purity of . . . to make physically impure or unclean") to conclude that, because "the introduction of fuel oil into a waterway such as Stamford Harbor . . . soil[ed], corrupt[ed], infect[ed], and/or render[ed][it] unfit for use," the "ordinary, lay definition of 'pollutant' includes fuel oil spilled in a waterway such as Stamford Harbor." *Id.* at 772–73, 653 A.2d 122.

■■■ A straightforward application of *Heyman Assocs.* to the facts of this case militates against coverage for Yale's asbestos abatement costs. As discussed *supra*, the only property damage for which Yale seeks coverage that IINA argues is excluded by the Contamination Exclusion is contamination caused by friable asbestos. As the Second Circuit recently recognized, "asbestos containing material ("ACM") . . . poses a health threat if and when it becomes 'friable,' an adjective describing a state of decay in which asbestos fibers or dust are released from ACM when disturbed. Friable asbestos poses a health risk because airborne fibers can become lodged in the lungs and respiratory tract, and over time may lead to asbestosis, mesothelioma and lung cancer." *Bell-South Telecommunications, Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 610 (2d Cir. 1996) (holding that a "harm caused by a product" under Conn.Gen.Stat. § 52–572n(a), from the use of asbestos-containing products, is the "contamination of the . . . building[ ] by asbestos and the consequent health risk to the building['s] occupants.") Thus, there can be little doubt that any asbestos contamination in Yale's buildings rendered them "unfit for use by the introduction of unwholesome or undesirable elements" and/or "physically impure or unclean," and therefore that the contaminating asbestos would be a "contaminant" or "pollutant" under the policies' Contaminant Exclusion.

Yale correctly notes that some recent cases have limited similarly worded pollution exclusions to the traditional environmental pollution context. This court is not, however, persuaded by the reasoning of the cases cited by Yale in favor of limiting the scope of the Contaminant Exclusion to traditional environmental pollution. Yale first relies on *Danbury Ins. Co. v. Novella*, 45 Conn.Supp. 551, 727 A.2d 279 (1998). In that case, the court had occasion to apply *Heyman Assocs.* to determine whether a landlord's liability insurance policy's pollution exclusion excluded coverage for a personal injury suit alleging that a minor tenant had been exposed to, and harmed by, dangerously high levels of lead paint in both "intact and nonintact conditions on the interior and exterior surfaces of the premises." [17] The court defined its task as determining "whether the only reasonable interpretation of the [pollution exclusion] clause would categorize lead paint itself, on the interior and exterior surfaces of a residence, as a pollutant." *Id.* The court held that the pollution exclusion was "ambiguous because it is equally reasonable to conclude that lead paint may or may not be an irritant or contaminant, and therefore may or may not be a pollutant, within the meaning of the clause." *Id.* at 558–59, 727 A.2d 279.

**17.** The policy at issue in *Novella* excluded from coverage "bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants . . . at or from premises owned, rented or occupied by the named insured." *Id.* at 280. The policy defined pollutants as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.*

The *Novella* decision holds that lead paint is not unquestionably a "solid irritant," "contaminant" or "pollutant" because "[t]he reach of the pollution exclusion clause must be circumscribed by reasonableness," and because "the overwhelming trend has been to hold that pollution exclusion clauses do not exclude contaminants such as lead paint poisoning." *Id.* at 555, 556, 727 A.2d 279 (citation and internal quotations omitted). As even the *Novella* court itself recognized, however, in *Heyman Assocs.* the Connecticut Supreme Court specifically declined "to follow other courts that have criticized the potential breadth of such words as 'irritant' and 'contaminant' when used in pollution exclusion clauses." *Id.* at 555 n. 6, 727 A.2d 279.

Moreover, even those cases that supposedly represent a "trend" towards interpreting the pollution exclusion as applying only to traditional environmental pollution, are inapposite. First, many of those cases, applying the law of jurisdictions other than Connecticut, do not limit their analysis to the language of the policy, but rather look to the intent of the insurers in drafting the pollution exclusion and the exclusion's history. *See, e.g., Stoney Run Co. v. Prudential–LMI Commercial Ins. Co.,* 47 F.3d 34 (2d Cir.1995) (the court "construe[d] the standard pollution exclusion clause in light of its general purpose"); *Sphere Drake Ins. Co. v. Y.L. Realty Co.,* 990 F.Supp. 240 (S.D.N.Y.1997) (examining, inter alia, the drafting history of the provision); *Sullins v. Allstate Insurance Co.,* 340 Md. 503, 667 A.2d 617, 620, 623 (1995) (after determining that a reasonably prudent layperson would consider lead-based paint to be a "contaminant," the court nevertheless

determined that the exclusion was ambiguous because it found that the insurance industry's intention was to exclude only environmental pollution).

▆▆▆▆ Under Connecticut law, however, "any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Tremaine v. Tremaine,* 235 Conn. 45, 57, 663 A.2d 387 (1995); *see also Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co. of Ill.,* 247 Conn. 801, 805, 724 A.2d 1117–20 (1999).[18] Stated another way, "[t]here is no presumption that language in insurance contracts is inherently ambiguous. It is well settled that only if the language manifests some ambiguity do we apply the rule that ambiguous insurance contracts are to be construed in favor of insureds and to provide coverage." *McGlinchey v. Aetna Cas. & Sur. Co.,* 224 Conn. 133, 137, 617 A.2d 445 (1992) (citations omitted.). Yale has not pointed to any language within the Contaminant Exclusion, or the policies generally, that renders the exclusion ambiguous. Extra-contractual evidence is, therefore, simply inapposite. *See Buell Indus., Inc. v. Greater N.Y. Mut. Ins. Co.,* 259 Conn. 527, 546, 791 A.2d 489 (2002) (refusing to consider drafting history where court found pollution exclusion to be unambiguous). The court therefore concludes that the policies' Contaminant Exclusion clearly and unambiguously precludes coverage for Yale's asbestos-related claims. *See American Heritage Realty Partnership v. La Voy,* 209 A.D.2d 749, 618 N.Y.S.2d 125 (N.Y.A.D. 3 Dept.1994) (asbestos excluded contaminant); *A–One Oil, Inc. v. Massachusetts Bay Insurance Co.,* 250 A.D.2d 633, 672 N.Y.S.2d 423

---

**18.** Of course, "the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Ste-* *phan v. Pennsylvania Gen. Ins. Co.,* 224 Conn. 758, 763–64, 621 A.2d 258 (1993) (Internal quotation marks omitted.).

(N.Y.A.D. 2 Dept.1998) (bodily injury and property damage arising out of indoor asbestos fibers) ("The fact that asbestos was released in the basement of the Wolff residence does not bring the claim outside the scope of the exclusion, as indoor air contamination can constitute environmental pollution."); *Kosich v. Metropolitan Property & Casualty Ins. Co.*, 214 A.D.2d 992, 626 N.Y.S.2d 618 (N.Y.A.D. 2 Dept.1995) ("losses proximately caused by asbestos contamination [were] excluded from coverage"); *Great Northern Ins. Co. v. The Benjamin Franklin Federal Savings & Loan Assoc.*, 793 F.Supp. 259 (D.Or.1990) (asbestos was also "pollutant" unambiguously excluded from coverage); *American States Insurance Co. v. Zippro Construction Co.*, 216 Ga.App. 499, 455 S.E.2d 133 (1995) (asbestos bodily injury); *Independent School District No. 197 v. Accident & Casualty Insurance of Winterthur*, 525 N.W.2d 600 (Minn.Ct.App.1995) (asbestos-related bodily injuries).

### E. *Conclusion*

IINA has succeeded in demonstrating that it is entitled to summary judgment on many but not all of Yale's claims for coverage under the all risk policies. Specifically, Yale is not entitled to coverage for losses caused by asbestos contamination because such claims are barred by the policies' unambiguous Contaminant Exclusion. IINA is not, however, entitled to summary judgment on all of Yale's claims for coverage of losses caused by lead contamination.

### III. THE SPECIFIED PERIL FIRST-PARTY PROPERTY POLICIES[19]

■ The plain language of the specified peril policies provides "insurance against direct physical loss or damage by fire, lightning, windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles, smoke, leakage from fire protection systems, vandalism and malicious mischief except as hereafter provided." In its responses to Requests for Admission, Yale admitted that it is not seeking coverage for any of these specified perils. (*See* Yale's Resps. at Fox.Aff., Ex. 36.) Yale has also offered no opposition to the Insurers' motion addressed to these policies, other than to insist that the Insurers submit an affidavit affirming that there are no endorsements to the policies extending coverage beyond the listed specified perils. It is, however, Yale's burden to prove the existence of coverage. *See Uberti v. Lincoln Nat. Life Ins. Co.*, 144 F.Supp.2d 90, 104 n. 5 (D.Conn.2001) ("It is a matter of settled law that the insured bears the burden of demonstrating that the loss suffered falls within the terms of the policy, and as such the existence of coverage is an essential element of plaintiff's claim."). Accordingly, because Yale has failed to offer any evidence whatsoever that coverage exists, the Insurers are entitled to summary judgment on the specified peril policies.

### CONCLUSION

For the foregoing reasons, the Insurers' motion for summary judgment on the third-party liability policies is granted [**doc # 154**], and the Insurer's motion for summary judgment on the first-party property policies is granted in part and denied in part [**doc # 152**].

It is so ordered.

---

**19.** Defendant Century Indemnity Company issued two specified peril policies (CX 11X028 (6/13/72–7/1/78) and CX 11X395 (8/1/76– 7/1/79)). Defendant Highlands issued one specified peril policy (F112987).